# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FIREFIGHTERS' PENSION SYSTEM OF THE CITY OF KANSAS CITY, MISSOURI TRUST, on behalf of itself and all other similarly situated stockholders of PRESIDIO, INC.,

Plaintiff,

v.

PRESIDIO, INC., ROBERT CAGNAZZI, STEVEN JAY LERNER, PANKAJ PATEL, TODD H. SIEGEL, HEATHER BERGER, CHRISTOPHER L. EDSON, SALIM HIRJI, MATTHEW H. NORD, MICHAEL A. REISS, APOLLO GLOBAL MANAGEMENT LLC, AP VIII AEGIS HOLDINGS, L.P., BC PARTNERS ADVISORS L.P., and LIONTREE ADVISORS, LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0839-JTL

## OPINION

Date Submitted: October 29, 2020
Date Decided: January 29, 2021

Michael Hanrahan, Samuel L. Closic, Stephen D. Dargitz, Jason W. Rigby, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, J. Daniel Albert, Stacey A. Greenspan, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Attorneys for Plaintiff.*

Kevin R. Shannon, Berton W. Ashman, Jr., Daniel M. Rusk, IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Ryan A. McLeod, Alexandra P. Sadinsky, Wilfred T. Beaye, Jr.*,* WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants Robert Cagnazzi, Steven Jay Lerner, Pankaj Patel, Todd H. Siegel, Heather Berger, Christopher L. Edson, Salim Hirji, Matthew H. Nord, and Michael A. Reiss.*

William M. Lafferty, John P. DiTomo, Alexandra M. Cumings, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Scott B. Luftglass, Rebecca L. Martin, Anne S. Aufhauser, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York; *Attorneys for Defendants Apollo Global Management, Inc. and AP VIII Aegis Holdings, L.P.*

Raymond J. DiCamillo, Kevin M. Gallagher, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; John L. Hardiman, SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Defendant LionTree Advisors LLC.*

A. Thompson Bayliss, E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Matthew Solum, Courtney A. Carvill, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendant BC Partners Advisors L.P.*

**LASTER, V.C.**

The plaintiff is a former stockholder of Presidio, Inc. (the "Company"). The complaint supports a reasonable inference that the Company's financial advisor tipped one of the bidders during the Company's sale process, resulting in a price below what the Company's board of directors (the "Board") otherwise could have achieved.

The Company merged with an acquisition vehicle controlled by BC Partners Advisors L.P. ("BCP"), a private equity firm. The merger resulted in each of the Company's publicly held shares being converted into the right to receive $16.60 in cash (the "Merger"). The Company's controlling stockholder, Apollo Global Management LLC, received the same per-share consideration as the public stockholders.

Before the Company started its sale process, Apollo and its financial advisor—LionTree Advisors, LLC—met with BCP and another private equity firm, Clayton Dubilier & Rice, LLC ("CD&R"). Later, LionTree and Robert Cagnazzi, the Company's chairman and CEO, met with CD&R. CD&R signaled its interest in a transaction, but did not indicate that it would retain existing management. Unlike BCP, CD&R had a portfolio company that operated in the same industry. CD&R therefore could pay a price that included synergies, but it also had an existing management team, meaning that Cagnazzi might not keep his job in a deal with CD&R. BCP, by contrast, was purely a financial buyer. BCP could not offer a price that included synergies, but BCP was eager to retain existing management.

A month later, BCP contacted LionTree to express interest in a transaction. Based on LionTree's description of the earlier contacts with CD&R, the Board opted to pursue a single-bidder strategy with BCP, rather than also engaging with CD&R. At this stage of

the proceeding, it is reasonable to infer that LionTree's description of its earlier contacts was incomplete.

With LionTree now working as the Company's financial advisor, the Board entered into discussions with BCP. The Board made clear that any transaction would be subject to a post-signing go-shop. The discussions resulted in a merger agreement that contemplated a transaction at $16.00 per share, subject to a go-shop (the "Original Merger Agreement").

During the go-shop phase, CD&R offered to acquire the Company for $16.50 per share, thereby qualifying as an "Excluded Party" under the Original Merger Agreement. As a result, the Company could continue negotiating with CD&R for another ten days and only would have to pay a termination fee of $18 million to terminate the Original Merger Agreement for a deal with CD&R. If the Company reached a deal with any other party, the Company would have to pay $40 million.

Unbeknownst to the Board, LionTree tipped BCP about the price of CD&R's bid. BCP immediately submitted a revised bid at $16.60 per share, outbidding CD&R by just 10¢. BCP conditioned its bid on the Company increasing the termination fee to $41 million for any competing deal, regardless of the counterparty's status as an Excluded Party. BCP demanded that the Company respond within twenty-four hours.

Oblivious to LionTree's tip, the Board instructed LionTree to ask CD&R to strengthen its bid. To meet BCP's deadline, the Board required that CD&R respond in less than twenty hours. CD&R met the deadline and represented that it could raise its bid to at least $17.00 per share. CD&R objected to any changes in the go-shop process and indicated that it would likely walk if the Company increased the termination fee.

After receiving CD&R's response, and still oblivious to LionTree's tip, the Board accepted BCP's offer and entered into an amended merger agreement (the "Amended Merger Agreement"). After the Company publicly announced the Amended Merger Agreement, CD&R walked.

The complaint names as defendants Cagnazzi, the other members of the Board, Apollo, LionTree, and BCP. The plaintiff maintains that Cagnazzi, the other directors, and Apollo breached their fiduciary duties during the sale process by (i) approving the Amended Merger Agreement and (ii) failing to disclose all material information to the stockholders in connection with the vote on the Merger. The complaint maintains that LionTree and BCP aided and abetted the fiduciary defendants in breaching their duties. The complaint asserts a claim in the alternative against Apollo for aiding and abetting, but the defendants did not dispute that Apollo was a controlling stockholder that owed fiduciary duties to the Company and its other stockholders. This decision therefore analyzes Apollo's potential liability as a fiduciary rather than as an aider and abettor.

All of the defendants have moved to dismiss the complaint for failure to state a claim on which relief can be granted. This decision denies the motion as to Cagnazzi, LionTree, and BCP. It grants the motion as to Apollo and the other members of the Board.

## I.     FACTUAL BACKGROUND

The facts are drawn from the amended complaint and the documents that it incorporates by reference. At this procedural stage, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

**A.     Apollo Acquires The Company.**

Before the Merger, the Company was a Delaware corporation with its headquarters in New York, New York. The Company provided information technology solutions, including services related to digital infrastructure, the cloud, and security.

In February 2015, Apollo paid approximately $1.3 billion to purchase the Company from another private equity firm. Apollo acquired the Company through defendant AP VIII Aegis Holdings, L.P. ("Fund VIII"), which is an investment fund managed by Apollo. This decision refers to the Apollo entities together as "Apollo," except where greater specificity is warranted.

When Apollo acquired the Company, Cagnazzi served as its CEO, and his brother Chris served as a member of the Company's leadership team. After the acquisition, Apollo continued to employ both Cagnazzi brothers. In June 2016, the Company hired a third Cagnazzi brother, Victor, to work in its "Cloud/[Internet of Things] Tri-State division." Compl. ¶ 48 n.7.

In March 2017, the Company completed an initial public offering of 16,666,666 shares of common stock at $14 per share. LionTree acted as the Company's financial advisor for the IPO. After the IPO, Apollo's holdings represented 75.6% of the Company's voting power. From then until the Merger, the Company's stock traded on the NASDAQ Global Select Market under the ticker symbol "PSDO."

Concurrently with the IPO, Apollo and the Company executed a stockholders agreement, under which Apollo received the right to designate five of the Board's nine directors, as long as Apollo held at least 50% of the Company's common stock. If Apollo's

4

common stock ownership dipped below 50%, then the number of directors that it could appoint would fall in proportion to its voting power. The stockholder agreement also provided that as long Apollo held at least 30% of the Company's common stock, then the Company could not terminate Cagnazzi or designate a new CEO without the approval of a majority of Apollo's director designees.

About two-and-a-half years after acquiring the Company, Apollo began liquidating its equity position. On its fourth quarter 2017 earnings call, Apollo announced that its investment in the Company was maturing and that Apollo was "starting to set [itself] up for valuation." Compl. ¶ 37. Between November 2017 and March 2019, Apollo sold more than twenty-one million shares of Company common stock through four secondary offerings. Apollo announced each of these four sales on the heels of positive earnings announcements and corresponding increases in the Company's stock price. Each time Apollo announced a sale, however, the Company's stock price fell.

After the fourth sale, Apollo's equity stake and its associated voting power had declined to 42%. As a result, Apollo would be entitled to appoint only four of the nine members of the Board at the Company's next annual meeting. If the Company maintained its past practice, then the Company's next annual meeting would take place in November 2019.

At all times relevant to this action, the Board comprised nine directors. Five worked for Apollo, either as partners or principals (the "Apollo Directors"). Three were unaffiliated, outside directors (the "Outside Directors"). The ninth was Cagnazzi.

**B. Apollo Explores A Sale.**

In May 2019, Apollo began to consider a sale of the Company. On its second quarter 2019 earnings call, Apollo announced its expectation "that 2019 exit activity in Fund VIII will be concentrated in Q4." Compl. ¶ 37. Apollo looked to LionTree for assistance. The lead banker on the engagement was Ehren Stenzler.

LionTree had an extensive relationship with Apollo. LionTree was advising Apollo on its $2.7 billion acquisition of Shutterfly, Inc., and on a multi-billion-dollar acquisition of a majority interest in Cox Media Group's radio stations. In the two years preceding August 1, 2019, LionTree had received almost $16 million in investment banking fees and commissions from Apollo. LionTree also had co-invested with Apollo, including in Apollo's $2 billion acquisition of West Corporation in 2017. LionTree also served as Apollo's financial advisor for that deal. *See id.* ¶¶ 41–42. As noted, LionTree served as the Company's financial advisor for the IPO.

When Apollo and LionTree began exploring a sale, the Company's stock price had been hovering around $13 per share. In an earnings call on May 14, 2019—after the Company had beaten analysts' estimates and increased its full year guidance—Cagnazzi "wholeheartedly agree[d]" that Presidio's trading multiples did not "make much sense" in light of the Company's performance. *Id.* ¶ 162.

The complaint alleges that Apollo's sales of stock in the secondary market chiefly accounted for the Company's discounted stock price. The Company repeatedly disclosed as a risk factor that Apollo's sales of substantial amounts of stock "could cause [its] stock price to decline." *Id.* ¶ 35. Analysts also commented that Apollo's sales and the resulting

6

overhang had depressed the price of the Company's stock. In one of its presentations to the Board about the Merger, LionTree advised the Board that the Company's stock price was "sensitive to large Apollo overhang (~43% ownership) and ongoing sell-downs" and that there were "[l]imited catalysts to meaningfully drive stock price." Dkt. 110 Ex. 3 at '219.

## C.    Apollo And LionTree Meet With BCP And CD&R.

In May 2019, Apollo and LionTree met with BCP and CD&R. Those meetings were part of Apollo and LionTree's efforts to explore a sale of the Company.

BCP is private equity firm headquartered in London that has over €22 billion in assets under management. BCP markets itself as "align[ing] [itself] with strong, incentivized management teams and companies where there are attractive exit alternatives." Compl. ¶ 24. Two BCP executives—Edward Goldthorpe and Patrick Schafer—are former Apollo executives who left Apollo for BCP in 2017 and 2018 respectively. Goldthorpe and Schafer worked at Apollo when it acquired the Company.

CD&R is a private equity firm with more than $130 billion in assets under management. In April 2019, CD&R announced its acquisition of Sirius Computer Solutions, which operated in the same line of business as the Company. By acquiring the Company and combining it with Sirius, CD&R could generate synergies that likely would enable CD&R to pay a higher price than a purely financial buyer.

When Apollo and LionTree met with BCP and CD&R, Apollo "discussed views on the Company's industry including recent consolidation activity that had taken place." *Id.* ¶ 46. Apollo also discussed the possibility of a transaction to monetize its interest in the Company.

7

The Board did not authorize these meetings. Apollo and LionTree did not inform the Board about the meetings until months later.

**D.     The June 5 Meeting**

On June 5, 2019, Cagnazzi and Stenzler of LionTree met with CD&R (the "June 5 Meeting"). Although CD&R's acquisition of Sirius meant that CD&R likely could pay a higher price than BCP, it created issues for Cagnazzi and his management team. Through Sirius, CD&R had access to a management team capable of operating the combined company. As a result, CD&R might not need to retain Cagnazzi, his brothers, or other Company executives. By contrast, BCP was purely a financial buyer that needed a management team to operate the Company.

The record contains conflicting accounts of the June 5 Meeting. According to the proxy statement for the Merger, the purpose of the June 5 Meeting was "to generally discuss the broader industry landscape." Dkt. 110 Ex. 1 (the "Proxy") at 26. But based on a letter that CD&R sent to the Board in September 2019, the complaint alleges that the purpose of the meeting was to discuss a potential transaction between CD&R and the Company. CD&R's letter stated,

> At the time [of the June 5 Meeting], [CD&R's] detailed review of the industry and competitive landscape suggested that Presidio and Sirius represent[ed] two strong players in an attractive industry, each with an impressive historical record of M&A and each well-positioned to benefit from the ongoing trend of industry consolidation. As a result, [CD&R] met with Bob Cagnazzi earlier this summer to discuss [CD&R's] investment in Sirius and Presidio's strategic goals in order to understand the logic for a potential merger in the future.

Compl. ¶ 47.

8

At this stage of the proceeding, it is reasonable to infer that the June 5 Meeting took place because CD&R was interested in a potential transaction involving the Company. It is also reasonable to infer that CD&R did not give Cagnazzi any comfort that his management team would run the combined company. It appears that CD&R instead indicated that it would treat a transaction as a merger of equals for purposes of assembling a combined management team and that Cagnazzi should meet with the CEO of Sirius.

The Board did not authorize LionTree and Cagnazzi to meet with CD&R. The first indication of any report to the Board about the June 5 Meeting appears in a presentation that LionTree gave to the Board six weeks later, after the Company already had engaged with BCP. The presentation described the June 5 Meeting as "a casual discussion of the landscape" and noted that CD&R was "in no rush to consider strategic options." *See* Dkt. 110 Ex. 3 at '209.

E.      **The Board Authorizes Discussions With BCP.**

On July 3, 2019, BCP contacted LionTree to discuss a potential acquisition of the Company. On July 8, the Board met telephonically (the "July 8 Meeting"). During the meeting, Cagnazzi introduced Stenzler of LionTree as the Company's financial advisor.

The record contains conflicting accounts of the July 8 Meeting. The minutes state,

> Mr. Cagnazzi, Mr. Nord [of Apollo] and Mr. Stenzler provided the members of the Board a summary of an informal meeting Mr. Stenzler had with [BCP] regarding a potential transaction with the [Company] as well as a discussion of the market for buy-outs generally. Mr. Stenzler also told the Board that he had recently discussed the [Company] with [CD&R], which in July of 2019 consummated a leveraged buyout of one of the [Company's] competitors. The representatives of CD&R told Mr. Stenzler that they would potentially be interested in a transaction involving the [Company], but required additional time to finish integration of their recent acquisition. Mr. Nord

9

stated that [Apollo] was open to the [Company] exploring a potential transaction in which [Apollo] and the other stockholders receive the same consideration. Management also expressed support for a potential transaction.

Dkt. 110 Ex. 4. The minutes do not indicate that Stenzler reported on the June 5 Meeting that Cagnazzi and LionTree had with CD&R.

According to the description of the July 8 Meeting in the Proxy, the Board "discussed whether LionTree should contact [CD&R] to assess [its] interest in a potential transaction with the Company." Proxy at 27. The minutes do not reflect that discussion. According to the Proxy, "LionTree informed the Presidio Board that, in informal conversations with [CD&R] following the introductory discussions, [CD&R] informed LionTree that [it was] focused on closing [its] pending acquisition of [Sirius], and [was] not focused on a strategic transaction in the near term." *Id.* Based on that disclosure, the plaintiff argues that LionTree's report during the July 8 Meeting was misleading in two respects: (i) CD&R had closed its acquisition on July 1, so as of July 8, the acquisition was not "pending," and (ii) CD&R had expressed interest in pursuing a transaction with the Company during the June 5 Meeting.

Based on Stenzler's presentation, the Board directed LionTree to engage with BCP. The Board decided not to contact CD&R.

F.     **Discussions With BCP Lead To An Offer.**

On July 12, 2019, the Company entered into a nondisclosure agreement with BCP. Three days later, Company management gave a presentation to BCP. Throughout the following week, Company management engaged in discussions with BCP.

10

On July 21, 2019, BCP offered to acquire the Company for $15.60 per share. BCP indicated that it would be able to sign a definitive agreement in around four weeks, as long as the parties could cooperate to complete BCP's initial due diligence.

BCP's offer letter signaled that it would retain Company management. The offer letter stated,

> At BC Partners, an important element of our investment philosophy is the strength of and alignment with the Company's management team to cooperatively build and grow our business. To that end and with authorization of the Board at the appropriate time before signing a definitive agreement, we would seek to engage with the senior management team about their continued involvement in the business, reinvestment of a portion of their proceeds into our transaction, and agreement on an incentive package post-closing.

Compl. ¶ 63.

## G.    The Board Makes A Counteroffer.

On July 22, 2019, the Board met to discuss BCP's offer. At the meeting, LionTree provided the Board with a presentation that gave additional background on the earlier discussions with CD&R. The "Situation Overview" provided the following cursory description:

- In recent months, LionTree has facilitated two introductory meeting with [the Company].

- Post announcement of CD&R's acquisition of Sirius, LionTree introduced a partner of CD&R to Apollo for a casual discussion of the landscape.

    o    Subsequent to that initial introduction, a follow up introduction was made between representatives of CD&R and [Cagnazzi].

    o    CD&R said [it was] focused on closing their acquisition (now closed) and [was] in no rush to consider strategic options, but

11

> thought a dinner between [Cagnazzi] and the Sirius CEO would make sense in due course.

- Around the same time, LionTree separately introduced a partner of BC Partners to Apollo for a similar casual discussion of the landscape.

  o Post that initial discussion, BC Partners conducted significant analysis of [the Company] based on public information.

  o On July 3rd, the representatives of BC Partners reached out to LionTree and expressed an interest in exploring a potential acquisition of [the Company].

Dkt. 110 Ex. 3 at '209.

LionTree's presentation noted that BCP did not yet have committed debt financing but "[e]xpect[ed] to have fully committed debt financing at the time of signing." *Id.* at '210. The presentation also noted that BCP anticipated conducting additional diligence. *Id.* LionTree's presentation emphasized BCP's desire to partner with management, stating that "[w]ith authorization of the Board at the appropriate time before signing a definitive agreement, [BCP] would seek to engage in discussion with senior management about their continued involvement, reinvestment and incentives post-closing." *Id.*

The Board instructed LionTree to tell BCP that the Board was "not prepared to support" a sale of the Company for $15.60 per share and "that a go-shop provision would be required as part of any potential transaction." Proxy at 27–28. The "Board also instructed LionTree to authorize [BCP] to begin discussions with potential debt financing sources and allow such financing sources to access data room." *Id.* at 28. It is reasonable to infer that by giving this authorization, the Board signaled to BCP that a deal was possible.

12

The Board met again on July 23, 2019. LionTree reported that BCP wanted a specific counteroffer on price and was "willing to include a go-shop in the transaction agreement provided there was an appropriate break-up fee." Compl. ¶ 68. The Board unanimously agreed to counter with "a price of $16.25 per share of common stock, coupled with a robust 'go-shop.'" *Id.*

## H.     The Agreement On Price

On July 24, 2019, BCP increased its proposal to $16.00 per share and agreed to a go-shop. BCP stated that $16.00 was its "best and final" offer. Compl. ¶ 69.

The Board met that day and "decided to move forward with negotiations with [BCP] on the basis of [its] revised offer." *Id.* To that end, the Board authorized Company counsel to prepare a draft merger agreement to send to BCP. It is undisputed that as of July 24, 2019, BCP and the Company had reached an agreement on price.

## I.     LionTree Discloses Its Relationships.

On August 1, 2019, after LionTree had been running point on the transaction for a month, and a full week after the Board had reached an agreement with BCP on price, LionTree provided the Board with a disclosure letter describing its relationships with Apollo and BCP. The disclosure letter reported that in the past two years, LionTree had (i) received approximately €3.75 million in advisory fees from BCP, (ii) received almost $16 million in investment banking fees and commissions from Apollo, and (iii) co-invested with Apollo, including on a multi-billion-dollar acquisition. The disclosure letter indicated that LionTree simultaneously was advising Apollo on two other deals. In the two years before August 1, 2019, LionTree had received only $68,000 in fees from the Company.

13

On August 5, 2019, the Board met to discuss the disclosures. The Board asked Stenzler if any of the fees or engagements were material to LionTree. Stenzler said they were not. The Board then approved LionTree serving as the Company's financial advisor.

Also on August 5, 2019, LionTree told the Board that BCP had asked to meet with Cagnazzi to discuss the terms of his post-closing employment. The Board authorized the meeting, but indicated that any agreements or arrangements would require pre-approval from both the Board and the compensation committee.

On August 9, 2019, the Board met to discuss the status of the potential acquisition. By then, Cagnazzi had met with BCP. LionTree told the Board that BCP "had formally requested to share a roll-over agreement and a term sheet with respect to a management equity plan." Proxy at 29. The Board approved the request and reiterated that the Board and its compensation committee would need to pre-approve any final arrangements or agreements.

**J.      The Board Approves The Original Merger Agreement.**

During a meeting of the Board on August 12, 2019, LionTree reviewed its financial analyses and delivered a preliminary oral fairness opinion. Company counsel discussed the terms of the go-shop provision, including its duration and the associated termination fees. Cagnazzi provided the Board with an overview of his discussions with BCP about compensation arrangements for the management team, including for himself and his brother, Chris.

The Board also reviewed an illustrative timeline for the transaction. Because BCP was based in London, it was a foreign acquirer, meaning that the Company had to make a

14

filing with and obtain approval from the Committee on Foreign Investment in the United States ("CFIUS"). The Company planned to make the filing in mid-September, meaning that CFIUS review (which can last up to 105 days) would conclude by mid-December. The parties expected that the transaction would close around December 24, 2019.

At the end of the meeting, the Board met in executive session with Cagnazzi, who proposed that LionTree receive a success fee equal to 1.5% of the transaction value. The Board then adjourned until the next day.

On August 13, 2019, the Board reconvened. LionTree delivered its final fairness opinion. The merger consideration of $16.00 per share fell within the range of $14.99 to $21.30 per share that LionTree had generated using a discounted cash flow analysis. In its fairness presentation, LionTree devoted a slide to reviewing the go-shop provision.

The Board approved the Original Merger Agreement, then met in executive session. Cagnazzi reported on a further discussion with Stenzler that took place after the August 12 meeting had adjourned. Based on that discussion, Cagnazzi proposed increasing LionTree's compensation from 1.5% to 1.575% of transaction value. The Board agreed.

On August 14, 2019, the parties signed the Original Merger Agreement. *See* Dkt. 110 Ex. 1, Annex A ("OMA"). The price of $16.00 per share represented a premium of approximately 20% over the Company's trading price. The transaction valued the Company's equity at around $2.1 billion.

The Original Merger Agreement called for a post-signing go-shop, which it divided into two phases: the "Go-Shop Phase" and the "No-Shop Phase." *See* OMA § 6.4 (the "Go-Shop Provision"). The Go-Shop Phase ran from August 14, 2019, until 11:59 p.m. on

15

September 23, 2019 (the "No-Shop Period Start Date"). During the Go-Shop Phase, the Company had the right to

(i) solicit, initiate, propose or induce the making, submission or announcement of, or encourage, facilitate or assist, any proposal or offer that could constitute a Company Takeover Proposal,

(ii) provide information (including non-public information and data) relating to the Company or any of its subsidiaries and afford access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company or any of its Subsidiaries . . . to any Person. . . ,

(iii) engage in, enter into, continue or otherwise participate in, any discussions or negotiations with any Persons . . . with respect to any Company Takeover Proposals . . ., and

(iv) cooperate with or assist or participate in or facilitate any such inquiries, proposals, offers, discussions or negotiations or any effort or attempt to make any Company Takeover Proposals.

OMA § 6.4(a) (formatting added).

After the No-Shop Period Start Date, the Company had to stop these activities, and the Go-Shop Provision converted into a standard no-shop clause. The only exception provided that the Company could continue to negotiate with any "Excluded Party" until the tenth day following the No-Shop Period Start Date, or 11:59 p.m. on October 3, 2019 (the "Cutoff Time").

The Original Merger Agreement defined an Excluded Party to mean a person who, before the No-Shop Period Start Date, made a Company Takeover Proposal that the Board determined in good faith "constitutes or would be reasonably expected to lead to a Company Superior Proposal." OMA § 1.1 at A-8. The Original Merger Agreement defined a "Company Superior Proposal" as a proposal

16

which the Company Board determines in good faith . . . to be more favorable to the Company and its stockholders from a financial point of view than the Transactions and is reasonably likely to be timely consummated in accordance with its terms, in each case, taking into account all relevant factors (including all the terms and conditions of such proposal or offer (including the transaction consideration, conditionality, timing, certainty of financing, and/or regulatory approvals and likelihood of consummation) and this Agreement . . . ).

OMA § 1.1 at A-5.

The Merger Agreement established a two-tiered termination fee, tied to the Go-Shop Provision's two phases. If the Company terminated the Merger Agreement to pursue a Company Superior Proposal during the Go-Shop Phase, then the Company would pay BCP a termination fee of $18 million. That fee represented approximately 1.4% of the equity value of the deal or $0.22 per share. If the Company terminated the Merger Agreement during the No-Shop Phase, then the Company would pay BCP a termination fee of $40 million. That fee represented 3% of the equity value of the deal or $0.48 per share. If the Company pursued a Company Superior Proposal with an Excluded Party, then the Company only had to pay the $18 million fee, regardless of whether it pursued the transaction during the Go-Shop Phase or the No-Shop Phase. The lower termination fee was a key benefit of Excluded Party status.

The Original Merger Agreement did not require the Company to inform BCP about its discussions during the Go-Shop Phase. The Company's only obligation was to provide BCP with the identity of each Excluded Party "[a]s promptly as reasonably practicable, and in any event within one (1) Business day following the No-Shop Period Start Date."

17

OMA § 6.4(a). The Original Merger Agreement thus entitled BCP to learn the identity—but only the identity—of any Excluded Party on or before September 24, 2019.

The Original Merger Agreement did not entitle BCP to any additional information about an Excluded Party or its offer until after the Cutoff Time. Only then was the Company obligated to provide BCP with "the material terms and conditions" of the Company Takeover Proposal, including "unredacted copies of all proposed transaction documents." OMA § 6.4(d).[1]

When the parties entered into the Original Merger Agreement, Cagnazzi beneficially owned 545,484 shares of common stock, plus vested and unvested options to purchase another 1,723,528 shares of common stock. Under the Original Merger

---

[1] BCP had a five-day match right under the Original Merger Agreement, but it was only triggered if the Board changed its recommendation regarding the Merger, failed to reaffirm its recommendation in favor the Merger upon request, or entered into a competing acquisition agreement. Under those circumstances, the Company had an obligation to inform BCP of the identity of the person making the Company Superior Proposal and its material terms. The Company also had to provide BCP with a copy of the proposal and any proposed transaction agreement or other documentation to "negotiate with [BCP] in good faith . . . to make such adjustments to the terms and conditions of [the Original Merger Agreement] as [BCP] may propose." OMA § 6.4(e). At that point, the Board would be obligated to determine in good faith whether the Company Superior Proposal "would nevertheless continue to constitute a Company Superior Proposal." *Id.* By its terms, the matching right did not apply to a proposal received during the Go-Shop Phase unless the Company took one of the other actions that would trigger it. The matching right thus did not give BCP any additional rights to information for purposes of this case.

The parties also executed a voting agreement, under which Apollo agreed to vote its entire block of shares in favor of the Merger. By its terms, the voting agreement terminated automatically upon a "Change of Recommendation," as defined in the Original Merger Agreement. It does not play a significant role in this case.

18

Agreement, all of Cagnazzi's unvested options would accelerate at closing and he would receive a cash payment for each option equal to the difference between the merger consideration and the exercise price. *See* OMA § 3.1(c)(1).

Cagnazzi agreed to roll over 363,656 shares of his common stock into the post-transaction entity at the deal price, reflecting two-thirds of his shares. He also agreed to invest two-thirds of the cash that he received from his options in equity of the post-transaction entity, again at the deal price. Cagnazzi thus was a net buyer in the Merger. *See* Compl. ¶ 16.

### K.     The Go-Shop Phase

The Go-Shop Phase began on August 14, 2019, immediately after the Company and BCP executed the Original Merger Agreement. That same day, LionTree contacted fifty-two potential buyers, including CD&R.

CD&R expressed interest. By August 18, 2019, CD&R had executed a confidentiality agreement. On August 20, CD&R received access to the data room. After CD&R and the Company negotiated a clean room agreement, the Company populated the clean room and CD&R began conducting diligence, which continued actively through at least September 12.

On August 29, 2019, the Company announced record quarterly revenue for the fourth quarter of 2019—the fifth consecutive quarter that the Company announced positive quarterly results. The Company also announced financial results for the 2019 fiscal year, including revenue growth of 9.4%, which exceeded the top end of management's guidance of 6% to 8%.

19

On September 18, 2019, Cagnazzi told the Board that he anticipated receiving a bid from CD&R on September 23. On September 19, CD&R sent a markup of the Original Merger Agreement to the Company. Among other changes, CD&R deleted all of the references to Cagnazzi's post-Merger employment and equity roll-over. CD&R did not mark up any of the conditions to closing. CD&R also sent a fifty-eight-page draft debt commitment letter from Credit Suisse, whose counsel promptly received access to the data room and began conducting due diligence.

In anticipation of CD&R's bid, two of Apollo's director designees scheduled a call with LionTree and the Company's outside counsel to discuss the bid. The other members of the Board were not invited to this call.

## L.    CD&R Tops BCP's Offer.

On September 23, 2019, CD&R submitted a written proposal to acquire the Company for $16.50 per share. CD&R represented that it "could potentially increase [its] offer price upon" finalizing limited additional diligence. Compl. ¶ 95. CD&R noted that it already had shared with LionTree a list of the confirmatory diligence that CD&R needed to conduct. The proposal described CD&R's approach to the transaction as a "merger of equals" and referenced an upcoming meeting between Cagnazzi and the CEO of Sirius to discuss "plans for integration and ongoing management of the new company." *Id.*

CD&R also described its progress toward securing a financing package and stated that it was "comfortable accepting the CFIUS approval conditions in the existing merger agreement." *Id.* CD&R stated that it was "highly confident in [its] ability to get to a signed transaction prior to October 3rd." *Id.*

CD&R communicated its expectation that the offer would remain confidential, except for disclosure of its identity to BCP as required by the Original Merger Agreement. The offer letter stated,

> [N]o disclosure will be made to [BCP] regarding the terms of this proposal other than the disclosure of our identity as an Excluded Party as provided in the final sentence of Section 6.4(a) of your current merger agreement. If any such disclosure is made, this proposal shall automatically be immediately withdrawn.

*Id.* ¶ 115.

## M.    The Board Discusses CD&R's Bid.

Later on September 23, 2019, the Board met to discuss CD&R's proposal. The Board raised issues that, in hindsight, have an air of pretext. For example, the Board observed that the Company would have to pay a $18 million termination fee, but that was precisely what the Original Merger Agreement contemplated. The whole point of the Go-Shop Provision was to enable the Company to secure a better deal price in exchange for paying the fee.

The Board also noted that CD&R's markup of the Original Merger Agreement "contemplated a CFIUS filing and related closing condition." Compl. ¶ 101. The complaint's allegations support a reasonable inference that CD&R tried to simplify its markup by leaving the conditions to closing unchanged. In reality, CFIUS would not be an issue for CD&R. The firm was based in New York, meaning that it was not a foreign acquirer and would not have to make a CFIUS filing.

The Board also expressed concern that CD&R "had not yet secured committed debt financing." *Id.* ¶ 99. CD&R had obtained a fifty-eight-page draft debt commitment letter

from Credit Suisse, which indicated that CD&R likely would be able to obtain financing for a deal. At that point, BCP had not secured committed financing either, meaning that BCP and CD&R were similarly situated as to debt financing.

Notwithstanding these stated concerns, the Board concluded that the CD&R proposal "would be reasonably expected to lead to a Company Superior Proposal" and that CD&R thus qualified as an Excluded Party. *Id.* ¶ 103. The Board recognized that because CD&R owned Sirius, it potentially could offer an improved purchase price based on synergies between Sirius and the Company.

On September 24, 2019, LionTree and the Company's outside counsel told CD&R that it qualified as an Excluded Party. They also conveyed the Board's request that CD&R improve its offer by (i) increasing the purchase price based on potential synergies, (ii) securing committed financing, (iii) agreeing to pay the $18 million termination fee, and (iv) eliminating the CFIUS closing condition.

In accordance with the Original Merger Agreement, the Company notified BCP of its determination that CD&R qualified as an Excluded Party. The Company delivered the notice to BCP at 12:52 p.m. on September 24, 2019. The notice did not provide any information other than CD&R's identity. The content comported with the Original Merger Agreement, which provided that the Company was not required to disclose "the material terms and conditions" of an Excluded Party's proposal until after the Cutoff Time, i.e., 11:59 p.m. on October 3, 2019.

22

**N.     LionTree Tips BCP.**

Sometime before 11:10 a.m. on September 24, 2019, approximately two hours *before* the Company delivered the required notice to CD&R, Stenzler of LionTree tipped Raymond Svider, the chair of BCP, about CD&R's proposal. After talking to Stenzler, Svider immediately instructed his subordinates at BCP to prepare a revised proposal to acquire the Company for $16.60 per share—an increase of just 10¢ over the price that CD&R had offered. At this stage of the litigation, it reasonable to infer that Stenzler told Svider the price of CD&R's bid.

Until this litigation, the Board did not know that LionTree spoke with BCP before the Company delivered the notice. The Proxy did not mention the conversation.

Immediately after receiving the tip, BCP prepared a document analyzing a bid at $16.60 per share. The defendants have stressed that the document analyzed price points at 20¢ increments between $16.20 and $17.00, but that characterization is misleading. The first two pages of the document analyzed a bid of $16.60 per share. The first page addressed "Transaction Sources and Uses" and noted that "[r]equired equity will increase c. $55m from $799m to $855m." Dkt. 110 Ex. 7 at '301. The second page analyzed the "Composition of Returns" for the $16.60 bid compared to the original $16.00 bid. *Id.* at '302. Only the third page, titled "Sensitivities," analyzed the various price points at 20¢ increments between $16.20 and $17.00. And even that page highlighted in bold the original bid of $16.00 and the revised bid of $16.60. The plaintiff is entitled to the reasonable inference that BCP immediately honed in on a bid of $16.60 per share because Stenzler told Svider that CD&R had bid $16.50 per share.

Helping to pinpoint the timing of the tip, a BCP analyst emailed a partner at 11:10 a.m. on September 24, 2019, writing,

> [A]s you know we're on standby while [the Company's] goshop [sic] is in late stages. We're getting random frantic emails / calls around and just wanted to let you know I may need . . . help for random sprints here and there.

Compl. ¶ 116. BCP also contacted its outside counsel to discuss drafting a revised proposal letter and amendment to the Merger Agreement. In an email to counsel timestamped 11:32 a.m., BCP stated, "Just tried you both, have something very time sensitive to discuss, please call me on cell." *Id.* ¶ 117.

All of these communications took place before the Company sent the notice contemplated by the Original Merger Agreement to LionTree and BCP's counsel. The Company did not send that notice until 12:52 p.m. At the exact same time, Svider emailed an analyst, stating,

> I don't mean to complain but this is obviously an urgency and you need to be reachable because of that. Can you please send out asap the 2 pages we talked about to . . . [me] as we'll [need] to circulate to the [investment committee] later today? Thanks.

*Id.* ¶ 120. Within twenty minutes, the BCP analyst responded with the analysis of the $16.60 bid. *See* Dkt. 110 Ex. 7. Svider forwarded the document to the investment committee, noting that he "intend[ed] to submit the revised offer this evening NY time" and that it would "be valid for 24 hours or so." Compl. ¶ 121.

At 12:56 p.m., just four minutes after receiving the Company's notice by email, Stenzler forwarded it to BCP, writing, "FYI as mentioned to Raymond [Svider]." *Id.* ¶ 118. BCP's outside counsel also forwarded the Company's email to BCP. In response, BCP

24

asked its counsel when it could expect to receive "a draft of the letter." *Id.* ¶ 119. BCP's counsel emailed a draft letter to BCP by 1:15 p.m., just over twenty minutes after it received the Company's formal notice that CD&R was an Excluded Party. *Id.*

By 5:00 p.m., BCP's investment committee had approved the revised proposal and authorized BCP to share the proposal with the Company.

## O. Oblivious To The Tip, The Board Responds To BCP.

At 7:03 p.m. on September 24, 2019, BCP sent its revised offer to LionTree. BCP increased the deal price from $16.00 per share to $16.60 per share. In exchange, BCP asked to increase the termination fee to $41 million flat, increasing the higher fee by $1 million and altogether eliminating the lower fee for an Excluded Party. BCP imposed a deadline of 7:00 p.m. on September 25, 2019, for the Company to accept the offer, thus giving the Company twenty-four hours to respond.

The Board met at 8:15 p.m. on September 24, 2019. At that time, the Board did not know about LionTree's tip, and the meeting minutes do not mention it. "[A]fter discussion," the Board decided to require CD&R to "definitively strengthen" its offer by 5:00 p.m. on September 25, 2019, meaning that CD&R would have less than twenty hours to submit a revised offer. Compl. ¶ 125.

During the meeting on September 24, 2019, the Board also discussed how to respond to BCP's revised offer. The Board decided to ask BCP for an extension of the one-day deadline. The Board did not attempt to negotiate over the termination fee.

The Proxy indicates that the Board authorized its counsel to ask BCP to reduce the termination fee from $41 million to $40 million, but contemporaneous documents support

a different inference. After the meeting, the Company's General Counsel told Cagnazzi that the Company's outside counsel had changed the termination fee to $40 million and asked, "[D]id anyone tell you they would be doing that?" *Id.* ¶ 126. Cagnazzi answered, "No." *Id.* It is reasonable to infer that outside counsel made the change on its own.

BCP agreed to reduce the termination fee to $40 million, but refused to extend the twenty-four-hour deadline. Cagnazzi described BCP's response as "[g]ood news." *Id.* ¶ 127.

The Board ultimately decided to move forward on BCP's accelerated timeframe. The Board instructed LionTree to tell CD&R to submit a revised offer by 5:00 p.m. on September 25, 2019.

Later that night, LionTree told CD&R that BCP had improved its offer. LionTree did not tell CD&R that BCP had offered a price of $16.60 per share. LionTree appears to have told CD&R that BCP had conditioned its revised offer on a flat termination fee of $40 million.

**P.     CD&R Tops Again.**

CD&R responded before the Company's deadline. CD&R represented that it could "improve [its] offer to at least $17 per share." Compl. ¶ 135. CD&R objected to the new deadline and pointed out that "[t]he merger agreement permits the company to negotiate with an Excluded Party to reach a Superior Proposal until 11:59 p.m. on October 3, 2019." *Id.* ¶ 130. Describing the new deadline as "unexpected[]," *id.* ¶ 131, CD&R told the Company that

26

[t]here is no reason for the board to acquiesce to BC Partners' attempt to end-run a process that has a high probability of delivering greater value to the Company's stockholders. By signing a revised merger agreement with BC Partners at this time, the Company would be permitting $22 million of value from any Superior Proposal to go to BC Partners rather than the Company's stockholders (as a result of the increased fee break) and would in all likelihood result in the termination of our continued pursuit of the Company. We strongly urge the board not to agree to prematurely shut down the permitted time to negotiate with an Excluded Party and deprive Presidio's stockholders of the ability to receive a superior proposal,

*Id.* ¶ 132. CD&R also pointed out that it had been unable to complete its confirmatory diligence because "certain employee matters that [were] critical to [its] evaluation of the Company [were] only available to [CD&R] on a very restricted basis or through a clean" room, which "hinder[ed] [its] ability to deliver [a] proposal." *Id.* ¶ 134.

CD&R committed to provide a Company Superior Proposal in the amount of $17 per share or higher by "11:59 p.m. on October 1st," two days earlier than the Cutoff Time. *Id.* ¶ 135. The improved offer would have yielded at least $0.40 per share over BCP's revised offer.

**Q.  Oblivious To The Tip, The Board Accepts BCP's Bid.**

After receiving CD&R's response, the Board met to consider the competing proposals. The Board acknowledged that CD&R "had put forward an indicative price that was higher" than BCP's bid of $16.60 per share, but expressed several concerns about CD&R's proposal. Compl. ¶ 137.

The Board first noted that CD&R's proposal was "not definitive or legally binding." *Id.* But the Original Merger Agreement did not require that a Company Superior Proposal

be definitive or legally binding. CD&R also had committed to provide a binding offer by no later than October 1, 2019, two days before the Cutoff Time.

The Board also expressed concern that CD&R's offer was "subject to the completion of additional diligence." *Id.* ¶ 150. At this stage of the case, it is reasonable to infer that the Company could have provided access to the limited information that CD&R needed to complete its diligence. *See id.* ¶¶ 134, 152.

The Board continued to express concern about a potential CFIUS filing. But by this point, the Company's outside counsel had determined that a CFIUS filing likely would not be required for a deal with CD&R.

Based on these concerns with CD&R's proposal, the Board accepted BCP's revised offer and approved the Amended Merger Agreement. In making this decision, the Board calculated that increasing the termination fee by $22 million would raise the cost for CD&R to acquire the Company by $0.26 per share. The Board reasoned that if CD&R improved its offer from $16.50 to $17.00, then CD&R's improved price would account for the $0.26 per share increase and still provide an additional $0.24 per share of value for the Company's stockholders.

On September 26, 2019, BCP and the Company jointly announced the Amended Merger Agreement. As it had threatened to do, CD&R walked away.

R.    The Injunction Phase

The plaintiff filed suit on October 21, 2019. The complaint asserted claims against Cagnazzi and the Board for breach of fiduciary duty and against BCP for aiding and abetting those breaches. It did not name Apollo or LionTree. The complaint's allegations

28

were based in part on the plaintiff's review of the Company's books and records, which the Company produced in response to a demand for inspection under Section 220 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 220. The plaintiff sought to enjoin (i) the special meeting of the stockholders of the Company to vote on the Merger, which was scheduled for 9:40 a.m. on November 6, 2019, and (ii) consummation of the Merger.

On October 23, 2019, the court scheduled a hearing on the plaintiff's motion for a preliminary injunction for November 5, less than two weeks later. Because of the compressed timeframe, the plaintiff was able to conduct only limited discovery. On October 23, the plaintiff served interrogatories and requested documents from BCP, the Company, and the Board. The plaintiff did not obtain any discovery from LionTree or Apollo, neither of whom were defendants at that point. BCP, the Company, and the Board produced documents on October 28 and responded to interrogatories on October 30. The plaintiff did not have time to depose any witnesses.

On October 29, 2019, the Company filed a supplement to the Proxy. *See* Presidio, Inc., Current Report (Form 8-K) (Oct. 29, 2019) (the "Supplement" or "Supp."). The Supplement amended several of the Company's disclosures in the Proxy.

On November 5, 2019, the day before the stockholder vote, the court heard argument on the motion for preliminary injunction. At the conclusion of the hearing, the denied the application in an oral ruling. The court held that the plaintiff had failed to establish a reasonable probability of success on the merits and that the balancing of the equities counseled against an injunction. *See* Dkt. 80 at 112.

29

The special meeting on November 6, 2019, proceeded as planned. Including Apollo, holders of more than 85% of the Company's outstanding voting power voted in favor of the Merger. *See* Presidio, Inc., Current Report (Form 8-K) (Nov. 6, 2019). Also on November 6, Presidio announced its first quarter 2020 financial results, which reflected growth over the first quarter of 2019, including revenue growth of 2.9%, a 63.3% increase in net income, an 86.7% increase in diluted earnings per share, and a 19.6% increase in adjusted EBITDA. Compl. ¶ 167. The Merger closed on December 19.

**S.     The Plaintiff Files The Operative Complaint.**

On January 28, 2020, the plaintiff filed the currently operative complaint, adding Apollo and LionTree as defendants. The complaint contains six counts:

- Count I contends that Apollo was the controlling stockholder of the Company and that Apollo breached its fiduciary duties of loyalty and care by "benefit[ting] itself at the expense of Presidio's common stockholders." Compl. ¶ 208; *see id.* ¶¶ 201–06.

- Count II contends that the directors breached their fiduciary duties of loyalty and care by "negotiat[ing] the Company's sale through a fatally flawed process that resulted in an unfair price for Presidio's public stockholders" and "fail[ing] to disclose all material facts." *Id.* ¶ 209; *see id.* ¶¶ 207–14.

- Count III contends that Cagnazzi breached his fiduciary duties as a director and officer "by preferring his own interests to those of Presidio and its public stockholders." *Id.* ¶ 217; *see id.* ¶¶ 215–218.

- Count IV contends that BCP aided and abetted breaches of fiduciary duty by Apollo, the Board, and Cagnazzi. *See id.* ¶¶ 219–28.

- Count V contends in the alternative that if Apollo was not the Company's controlling stockholder, then Apollo aided and abetted breaches of fiduciary duty by the Board and Cagnazzi. *See id.* ¶¶ 229–37.

- Count VI contends that LionTree aided and abetted breaches of fiduciary duty by Apollo, the Board, and Cagnazzi. *See id.* ¶¶ 238–44.

All of the defendants moved to dismiss the complaint.

## II.     THE MOTION TO DISMISS STANDARD

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 535. "The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019) (citing *Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'")). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Cent. Mortg.*, 27 A.3d at 535.

### III.     THE SALE PROCESS CLAIMS

In challenging the sale process, the plaintiff asserts that Apollo wanted to liquidate its investment in the Company by the end of 2019. The complaint alleges that because of its desire for a near-term sale, Apollo favored a deal with BCP, believing that a transaction with BCP would close quickly. Apollo continued to prioritize a deal with BCP even after CD&R outbid BCP by offering $16.50 per share and indicating that it could go to at least $17.00. Because of its desire to lock in BCP's revised bid of $16.60, Apollo agreed to BCP's demand for an increased termination fee, even though the increased fee deprived CD&R of the principal benefit of being an Excluded Party. CD&R predictably walked away, which ended an active bidding contest.

Based on Apollo's alleged interest in a near-term sale, the complaint contends that the Apollo Directors breached their duty of loyalty. By virtue of their status as fiduciaries for both Apollo and the Company, the Apollo Directors were dual fiduciaries who faced a potential conflict between their competing duties. The complaint asserts that the Apollo Directors prioritized their duties to Apollo, pursued Apollo's desire for a near-term transaction, and thereby committed a non-exculpated breach of fiduciary duty.

The complaint contends that Cagnazzi faced a conflict of interest because he knew from early on in the process that BCP planned to retain him to lead the post-transaction entity. Consistent with that expectation, BCP agreed to provide Cagnazzi with a lucrative compensation package and equity upside. CD&R, by contrast, already owned Sirius and had backed its management team, meaning that if CD&R acquired the Company, Cagnazzi

might lose his job. The complaint asserts that Cagnazzi helped steer the deal to BCP in breach of his duty of loyalty.

The complaint maintains that LionTree aided and abetted the fiduciary defendants' breaches of duty by steering the deal to BCP and away from CD&R. The complaint's most troubling allegations support a reasonable inference that LionTree tipped BCP about the details of CD&R's bid, including its price, after receiving CD&R's bid and before the Company delivered to BCP the limited notice that the Original Merger Agreement contemplated. The tip enabled BCP to outbid CD&R by just 10¢ per share and negotiate an increased termination fee, which eliminated the principal benefit of Excluded Party status. Without the tip, BCP might have bid higher in an effort to preempt CD&R, resulting in a higher deal price. Or BCP might have bid lower, resulting in an active bidding contest. LionTree's tip enabled BCP to price its bid strategically, based on improperly disclosed information, and secure additional deal protection (the increased termination fee) that ended the bidding contest.

The complaint alleges that BCP aided and abetted the other defendants in their breaches of fiduciary duty. The complaint alleges that BCP knew about Apollo's desire for a near-term sale and had an existing relationship with LionTree, which resulted in the tip. The complaint alleges that BCP used its knowledge and its relationships to bid just 10¢ per share more than CD&R and demand an increase in the termination fee, thereby inducing the fiduciary defendants to end an active bidding contest.

## A. The Standard Of Review For The Sale Process Claim

The starting point for analyzing fiduciary action is to determine the correct standard of review. *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014). Delaware corporate law has three tiers of review: the business judgment rule, enhanced scrutiny, and entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). The Merger is subject to enhanced scrutiny.

### 1. The Possible Standards Of Review

Delaware's default standard of review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009). The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

"Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d

17, 44 (Del. Ch. 2013). Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1156, 1163 (Del. 1995) (emphasis in original) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which is Delaware's "intermediate standard of review." *Trados II*, 73 A.3d at 43. It governs "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *Id.* Framed generally, enhanced scrutiny requires that the fiduciary defendants "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007).

In *Revlon*, the Delaware Supreme Court applied the intermediate standard of review to the sale of a corporation. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179–82 (Del. 1986). Enhanced scrutiny applies in this setting because "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful . . . ." *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012). Put differently,

35

> [t]he heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.

*Dollar Thrifty*, 14 A.3d at 597 (footnote omitted). Consequently, "the predicate question" of the fiduciary's "true motivation" comes into play, and "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced" the fiduciary's decision. *Id.* at 598.

To satisfy enhanced scrutiny in an M & A setting, directors must establish both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision" and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994). "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598.

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011). The

reasonableness standard, however, does not permit a reviewing court to freely substitute its own judgment for the directors' judgment.

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45. Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005). "[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there." *Dollar Thrifty*, 14 A.3d at 595–96.

## 2. The Relationship Between The Standard Of Review And A Damages Claim

When a more intrusive standard of review than the business judgment rule applies, the standard of review provides the analytical framework for evaluating whether the transaction or decision should be respected in equity. Failing to meet the higher standard of review does not lead ineluctably to liability for the fiduciaries who made the decision.

While a member of this court, former Chief Justice Strine discussed these principles in terms of the entire fairness test: "The entire fairness test is, at its core, an inquiry

37

designed to assess whether a self-dealing transaction should be respected or set aside in equity. It has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction." *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008). A finding that a transaction is not entirely fair thus could lead to transaction-based relief, such as an injunction, rescission, or an equitable modification of the transaction's terms. *See, e.g.*, *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *32 (Del. Ch. Sept. 19, 2008) (modifying terms of stock issuance to de facto controlling stockholder after finding that terms were not entirely fair). But to determine whether individual fiduciaries should be held liable, a court must analyze each fiduciary's conduct to decide whether the fiduciary breached the duty of loyalty, including its subsidiary element of good faith, or the duty of care. *See Venhill*, 2008 WL 2270488, at *22. "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004).

The Delaware Supreme Court has drawn a similar distinction for purposes of enhanced scrutiny by distinguishing between "the transactional justification setting" and "the personal liability setting."[2] Delaware courts routinely apply enhanced scrutiny in the

---

[2] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374–75 (Del. 1995) (distinguishing between the "transactional justification" setting, in which enhanced scrutiny applies, and "personal liability" setting, in which the business judgment rule applies); *see Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1284 n.32 (Del. 1989) (distinguishing between "the traditional concept of protecting the decision itself" and the

transactional justification setting to evaluate the question of breach when determining

whether to enjoin a transaction from closing pending trial.[3] A court likewise will apply

enhanced scrutiny after trial to determine whether to issue a mandatory injunction, a

question of the "directors' personal liability for these challenged decisions"); *Revlon*, 506 A.2d at 180 n.10 (embracing the distinction between "the business judgment rule, which insulates directors and management from personal liability for their business decisions, and the business judgment doctrine, which protects the decision itself from attack"; noting that in "transactional justification cases," Delaware decisions had not observed the distinction in terminology, but nevertheless "may be understood to embrace the concept of the doctrine"); *see also Kahn v. Stern*, 2018 WL 1341719, at *1 n.4, 183 A.3d 715 (Del. Mar. 15, 2018) (ORDER) ("*Revlon* remains applicable [in a post-closing case] as a context-specific articulation of the directors' duties but directors may only be held liable for a non-exculpated breach of their *Revlon* duties."); *Corwin v. KKR Fin. Hldgs., LLC*, 125 A.3d 304, 312 (Del. 2015) ("*Unocal* and *Revlon* are primarily designed to give stockholders and the Court of Chancery the tool of injunctive relief to address important M & A decisions in real time, before closing. They were not tools designed with post-closing money damages claims in mind . . . ."); *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *28 (Del. Ch. Aug. 31, 2020) (noting that "the *Revlon* standard of review" is "applicable principally outside the damages context").

[3] *See, e.g.*, *Dollar Thrifty*, 14 A.3d at 595–99; *Toys "R" Us*, 877 A.2d at 999–1000. As a procedural matter, applying enhanced scrutiny at the injunction phase necessarily recognizes that enhanced scrutiny could apply at trial in the transactional justification setting, because the injunction standard considers whether the plaintiff has shown a reasonable probability of succeeding on the merits under the standard that would apply at trial. If the standard could not apply at trial, then it would not apply during the injunction phase either. *See, e.g.*, *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 118 (Del. 2007) (denying preliminary junction because the court was "not persuaded that the Special Committee's less-than-ideal approach to the price negotiations with [the buyer] makes it likely that the plaintiffs, after a trial, will be able to demonstrate a *Revlon* breach"); *Koehler v. NetSpend Hldgs. Inc.*, 2013 WL 2181518, at *24 (Del. Ch. May 21, 2013) ("Because I find that the Directors are unlikely to meet their burden at trial of proving that they acted reasonably throughout the sale process to [the buyer], the Plaintiff has shown a likelihood of success on the merits of her *Revlon* claim."); *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *5 (denying preliminary injunction because it did not appear likely that the plaintiff would succeed at trial under enhanced scrutiny).

permanent prohibitive injunction, or similar equitable relief that operates on a transactional

basis.[4]

---

[4] *See Citron v. Fairchild Camera Instrument Corp.*, 569 A.2d 53, 67–69 (Del. 1989) (affirming trial court's finding after ten-day trial that board's actions complied with enhanced scrutiny under *Revlon*); *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *2 (Del. Ch. Mar. 11, 2019) (finding in post-trial decision that deal protection measures in merger agreement failed enhanced scrutiny); *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 93–94 (Del. Ch. 2011) (applying enhanced scrutiny after trial when determining whether to order the redemption of a rights plan); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 28, 35 (Del. Ch. 2010) (applying enhanced scrutiny after trial to evaluate adoption of rights plan in private company; ordering rescission of rights plan); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 44–52 (Del. Ch. 1998) (applying enhanced scrutiny after trial to invalidate deferred-redemption feature in rights plan), *aff'd sub nom.*, *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998); *see also Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143–45 (Del. 1990) (reversing trial court's grant of summary judgment to defendants in post-closing setting; holding that trial court erred by failing to apply enhanced scrutiny under *Unocal*); *In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 487 (Del. Ch. 2000) (granting summary judgment in favor of defendants because there was "no dispute of fact that requires a trial regarding whether the defendants have met their burden under the *Unocal* test"); *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *5–6 (Del. Ch. Jan. 18, 1996) (scheduling trial on enhanced scrutiny claims under *Unocal* in connection with stock-for-stock merger; noting that the enhanced scrutiny inquiry "will of course quite often be ill-suited to pre-trial resolution since the question of reasonableness is necessarily highly contextual"). Delaware cases also have applied enhanced scrutiny after trial when assessing challenges to board action that affected stockholder voting rights, which is another situation involving transactional justification. *See, e.g.*, *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1131–32 (Del. 2003) (applying enhanced scrutiny to hold that directors failed to justify actions including enlargement of board and filling of vacancies in a manner that interfered with proxy contest and stockholder voting rights; reversing post-trial final judgment); *Johnston v. Pedersen*, 28 A.3d 1079, 1090–92 (Del. Ch. 2011) (applying enhanced scrutiny after trial to invalidate dilutive issuance); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 330–45 (Del. Ch. 2000) (applying enhanced scrutiny after trial to invalidate super-majority bylaw). Some earlier decisions, however, understood that enhanced scrutiny would govern at trial for purposes of damages claims as well. *See, e.g.*, *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *25 (Del. Ch. May 20, 2011, revised May 24, 2011) ("[I]n the absence of concomitant disclosure violations and where a plaintiff's complaint boils down to an allegation of inadequate price, Delaware courts have found that money damages can provide a sufficient remedy for a board's *Revlon* violations.");

A court does not apply enhanced scrutiny when determining whether a fiduciary should be held liable. "Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale." *Malpiede v. Townson*, 780 A.2d 1075, 1083–84 (Del. 2001). "The fact that a corporate board has decided to engage in a change of control transaction invoking so-called *Revlon* duties does not change the showing of culpability a plaintiff must make in order to hold the directors liable for monetary damages." *McMillan v. Intercargo Corp.*, 768 A.2d 492, 502 (Del. Ch. 2000). When assessing personal liability, a court must determine whether the fiduciary breached either the duty of loyalty, including its subsidiary element of good faith, or the duty of care.[5]

---

*Norberg v. Young's Mkt. Co.*, 1989 WL 155462, at *3 (Del. Ch. Dec. 19, 1989) (denying preliminary injunction; "Norberg's fundamental contention is that the $3,500 purchase price does not represent fair and full value for Young's commonstock [sic]. Assuming that he is correct in that assertion, and assuming that he can prove he is entitled to recover on his *Revlon* claim, there is no reason why Norberg cannot be made whole through an award of damages following trial.").

[5] The decisions that discuss the standard for imposing personal liability typically review the claim to evaluate the availability of exculpation under Section 102(b)(7) of the DGCL. *See, e.g.*, *Morrison v. Berry*, 2019 WL 7369431, at *12 (Del. Ch. Dec. 31, 2019); *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016). Section 102(b)(7) and its exceptions preserve liability for breaches of the duty of loyalty, including its subsidiary element of good faith, while permitting exculpation for breaches of the duty of care. The decisions that address the standard for imposing personal liability thus generally frame the analysis in terms of whether the plaintiff has stated a claim for breach of the duty of loyalty such that exculpation is unavailable.

Section 102(b)(7) does not change the nature of a cause of action for breach of duty, the elements of the claim, the standards of review that are used to assess breach, or the test

Even when a higher standard of review like enhanced scrutiny or entire fairness applies, a plaintiff can recover monetary damages for a breach of the duty of loyalty only by proving that the fiduciary "harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party . . . , or [otherwise] acted in bad faith."[6] A plaintiff can recover monetary damages for a breach of the duty of care only by establishing that the fiduciary was grossly negligent.[7] Of course, for an exculpated fiduciary, the care claim is irrelevant. *Corwin*, 125 A.3d at 312.

---

that is used to impose damages. Consequently, when decisions discuss whether a plaintiff has pled a claim for a breach of the duty of loyalty that is sufficient to support an award of damages in the face of a Section 102(b)(7) provision, the decisions necessarily are addressing whether a plaintiff has pled a claim for a breach of the duty of loyalty that is sufficient to support an award of damages.

Another way to approach the issue is to ask what a plaintiff must plead—and later must prove—to impose monetary damages *in the absence of an exculpatory provision*. Is it enough that a transaction was not entirely fair or fell short under enhanced scrutiny? Or does it require a showing that the fiduciary committed a specific breach of the duty of loyalty (through self-dealing, interested conduct, or action in bad faith) or of the duty of care (through gross negligence)? The weight of authority indicates that in the personal liability context, even without an exculpatory provision, a plaintiff would have to plead— and later would have to prove—that the fiduciary committed a specific breach of the duty of loyalty or the duty of care. Against this doctrinal backdrop, the presence of an exculpatory provision eliminates the prospect of liability for a breach of the duty of care, but it does not change how Delaware law operates in the personal liability setting.

[6] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015); *see Tangoe Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018); *Venhill*, 2008 WL 2270488, at *22; *McMillan*, 768 A.2d at 502.

[7] *Singh v. Attenborough*, 137 A.3d 151, 151 (Del. 2016) (ORDER) ("Absent a stockholder vote and absent an exculpatory charter provision, the damages liability standard for an independent director or other disinterested fiduciary for breach of the duty of care is gross negligence, even if the transaction was a change-of-control transaction."); *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 857 (Del. 2015) ("When disinterested

Here, the defendants sold the Company for cash. Accordingly, enhanced scrutiny provides the standard of review for evaluating the Merger. *See QVC*, 637 A.2d at 45. The plaintiff thus can state a claim for breach of duty by pleading facts supporting a reasonable inference that the Merger and the process that led to it fell outside the range of reasonableness. *Id.* But to plead a viable claim for damages against a fiduciary defendant requires more, and "an allegation implying that a Defendant failed to satisfy *Revlon* is insufficient." *USG*, 2020 WL 5126671, at *2. To plead a loyalty-based damages claim, the plaintiff must plead facts supporting a reasonable inference that the defendant failed to act reasonably to obtain the best transaction reasonably available, either due to interestedness, because of a lack of independence, or in bad faith. *Id.* at *29; *accord McMillan*, 768 A.2d at 502. To plead a care-based damages claim against a non-exculpated fiduciary, the plaintiff must plead facts supporting a reasonable inference that the defendant acted with gross negligence. *RBC*, 129 A.3d at 857; *Corwin*, 125 A.3d at 312.

---

directors themselves face liability, the law, for policy reasons, requires that they be deemed to have acted with gross negligence in order to sustain a monetary judgment against them."); *McMillan*, 768 A.2d at 505 n.56 (asserting in a case involving a post-closing damages claim that "[i]n the absence of the exculpatory charter provision, the plaintiffs would still have been required to plead facts supporting an inference of gross negligence in order to state a damages claim"); *see Corwin*, 125 A.3d at 312 (noting that the range-of-reasonableness standard under enhanced scrutiny "do[es] not match the gross negligence standard for director due care liability under *Van Gorkom*").

**B.    The Defendants' Arguments For Lowering The Standard Of Review**

Delaware decisions have identified paths for lowering the standard of review from enhanced scrutiny to the business judgment rule. The defendants rely on two of those paths: *Corwin* cleansing and the *Synthes* safe harbor.

### 1.    *Corwin* **Cleansing**

As part of a multi-pronged response to an explosion of non-meritorious challenges to mergers, the Delaware Supreme Court held in 2015 that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies." *Corwin*, 125 A.3d at 309. The *Corwin* decision

> stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule.

*USG*, 2020 WL 5126671, at *1.

The *Corwin* decision states that the cleansing effect of a stockholder vote does not apply to a transaction subject to the entire fairness standard. But despite this phrasing, *Corwin* precludes cleansing only when entire fairness applies *ab initio* because of the presence of a conflicted controlling stockholder. *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016). A transaction involves a conflicted controlling stockholder when (i) the controller stands on both sides of the deal, as in a parent-subsidiary merger, or (ii) the controller stands on only one side of the deal, as in a third-party sale but receives differential consideration for itself or another non-ratable benefit not shared by other

stockholders. *Id.* at \*8–9. A transaction involving a non-conflicted controlling stockholder is subject to *Corwin* cleansing.

*Corwin* cleansing also applies only when the approval by disinterested stockholders is "fully informed." 125 A.3d at 308–09. "[I]f troubling facts . . . were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked." *Id.* at 312.

For purposes of this case, determining whether *Corwin* cleansing applies requires both assessments. First, was Apollo a conflicted controller? Second, was the stockholder vote fully informed?

### a. Was Apollo A Conflicted Controller?

For purposes of the motion to dismiss, the defendants do not dispute Apollo's status as a controlling stockholder. The question is whether Apollo had a divergent interest in the Merger that gave rise to a conflict.

As a large stockholder who received the same consideration in the Merger as all other stockholders, Apollo's interests were presumptively aligned with those of the unaffiliated holders of the Company's common stock. Delaware law recognizes that when a fiduciary owns a material amount of common stock, that interest gives the fiduciary a "motivation to seek the highest price" and a "personal incentive . . . to think about the trade off between selling now and the risks of not doing so." *Dollar Thrifty*, 14 A.3d at 600. Such a fiduciary has an inherent economic incentive "to negotiate a transaction that will result in the largest return for all shareholders." *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002); *see In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392,

at *9 (Del. Ch. Jan. 7, 1991) (Allen, C.) (noting that directors' substantial stockholdings gave them "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

The complaint does not identify any non-ratable benefits that the Merger conferred on Apollo. Nor does the complaint identify any unique detriments that the Merger enabled Apollo to avoid. Instead, to overcome the presumption that Apollo's interests were aligned with those of the unaffiliated stockholders, the plaintiff alleges that Apollo faced a liquidity-driven conflict.

Delaware decisions recognize liquidity "as a benefit that may lead directors to breach their fiduciary duties."[8] But "liquidity-driven conflicts can be difficult to plead." *In*

---

[8] *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012) (internal quotation marks omitted); *see McMullin v. Beran*, 765 A.2d 910, 922, 926 (Del. 2000) (reversing the Court of Chancery's grant of a motion to dismiss a complaint, which alleged that the company's controller and its board designees "sacrific[ed] some of the value of [the target]" to accommodate the controller's "immediate need for cash"); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *42 (Del. Ch. Oct. 16, 2018) (finding after trial that two negotiators "had a divergent interest in achieving quick profits by orchestrating a near-term sale" of the company), *aff'd*, 211 A.3d 137 (Del. 2019); *Answers*, 2012 WL 1253072, at *7, *9 (denying a motion to dismiss after concluding that the complaint adequately alleged that a large stockholder's liquidity needs were a source of conflict for the stockholder's two board appointees); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9–10 (Del. Ch. Sept. 30, 2011) (denying a motion to dismiss after finding that allegations of a CEO's "desperate[]" need for liquidity supported an inference that the "liquidity benefit" constituted "a personal benefit not equally shared by other shareholders"); *Lear*, 926 A.2d at 113 (issuing a preliminary injunction where the CEO, "while negotiating the merger, had powerful interests to agree to a price and terms suboptimal for public investors so long as the resulting deal" yielded certain benefits, including "allow[ing] him to promptly liquidate his equity holdings").

*re Mindbody, Inc.*, 2020 WL 5870084, at *33 (Del. Ch. Oct. 2, 2020). Delaware courts "ha[ve] been reluctant to find [that] a liquidity-based conflict" rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration. *Larkin*, 2016 WL 4485447, at *16. To reach such a conclusion requires the court "to make [the] extraordinary inference[] that rational economic actors have chosen to short-change themselves" in favor of liquidity. *Id.* Accordingly, in most cases, "a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally . . . ." *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012).

To establish a liquidity-driven conflict, the plaintiff argues that Apollo (i) held its ownership stake in the Company for nearly twice its desired investment horizon, (ii) evidenced a desire to obtain liquidity by selling shares in secondary offerings, (iii) no longer would be entitled to appoint a mathematical majority of the Company's directors at the next annual meeting, and (iv) acted consistent with its interest in liquidity by preferring the BCP offer over CD&R rather than permitting a bidding contest to play out.

In response to these allegations, the defendants rely initially on language from *Synthes*. There, the court stated that an interest in liquidity could only

> constitute a disabling conflict of interest . . . [when the] circumstances . . . involve[d] a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation.

47

*Synthes*, 50 A.3d at 1036. The defendants accurately observe that the complaint does not support a reasonable inference that Apollo faced "a crisis" or an "exigent need" for cash.

As Vice Chancellor McCormick recently explained, the "hyperbolic language" in *Synthes* about a "crisis" or "fire sale" and an "exigent need" for "immediate cash" is best understood as reflecting the court's reaction to a particularly deficient complaint, which was "strikingly devoid of pled facts to support" a liquidity-driven conflict. *Mindbody*, 2020 WL 5870084, at \*17. She noted that by the time of oral argument, the plaintiffs in *Synthes* had "conceded that they did not plead facts supporting" aspects of their liquidity-driven theory. *Id.* In *Mindbody*, Vice Chancellor McCormick discussed *Synthes* at length, explaining persuasively why the extreme language in *Synthes* should not be read as establishing a general rule.

A complaint instead must allege facts that support a reasonable inference of a divergent interest, regardless of the source, that rises to the level of a disabling conflict. Several decisions of the court have concluded that complaints adequately alleged a divergent interest based on a liquidity-driven conflict. In *infoGROUP*, the complaint alleged that the blockholder owed $25 million, had no sources of income, recently had paid out $4.4 million, and wanted to start a new business venture. *See* 2011 WL 4825888, at \*9. In *Answers*, the complaint alleged that the stockholder needed to achieve a near-term sale, could not effectively generate liquidity because of the thinly traded market for the company's stock, and curtailed the sale process by taking actions that ran contrary to the advice of the company's investment banker. *See* 2012 WL 1253072, at \*1–2, \*7. Most recently, in *Mindbody*, the CEO of the target company candidly explained in a post-merger

48

interview that his capital had been locked up in the company for years and that he had only been able to "sell tiny bits of it" through a Rule 10b5-1 plan, a situation he analogized to "sucking through a very small straw." 2020 WL 5870084, at *3. The complaint also supported an inference that the CEO's "personal finances [were] stretched" leading up to the sale process. *Id.* Although he did not face a liquidity crisis, he had to meet a series of obligations, including a multi-million pledge to a local college, a seven-figure home renovation project, and payments on a sizeable mortgage. *Id.* He also wanted to make "a six-figure investment in his son's start-up company, a six-figure loan to a friend, and another six-figure investment in a new venture." *Id.* Evidencing his focus on liquidity, he drew on a line of credit and increased his periodic sales of stock. *Id.* at *3, *18.

In this case, the complaint's allegations—whether considered individually or collectively—do not support an inference that Apollo had a divergent interest in liquidity sufficient to create a disabling conflict. To support an inference that Apollo generally wanted to sell, the plaintiff alleges that as of 2019, "Apollo had been invested in Presidio through Fund VIII for over 4.5 years since 2015, which was two years beyond Fund VIII's 2.5 year average investment horizon."[9] As additional support, the plaintiff cites Apollo's fourth quarter 2017 earnings call, when Apollo described its investment in the Company

---

[9] Compl. ¶ 189. Apollo contends that the reference to 2.5 years in its public filings "refers to the average weighted age of Fund VIII's investments since acquiring such investments; not the investment horizon or length of time Fund VIII planned or plans to hold such investments." Dkt. 111 at 15 n.5. The distinction is immaterial for purposes of the inference the plaintiff seeks.

as maturing and stated that Apollo was "starting to set [itself] up for valuation." Compl. ¶ 37. The plaintiff's basic theory is that Apollo wanted to sell because under its private equity business model, the time had come for Apollo to harvest its investment in the Company. Indeed, as the plaintiff sees it, that time had passed two years earlier, in 2017, making Apollo an eager seller in 2019.

These allegations have some color at the pleading stage, but they closely resemble allegations in other cases that the court rejected as insufficient to support a liquidity-driven conflict.[10] It is true that investment fund managers cycle through a multi-year process of raising capital for a new fund, launching the fund, investing the fund's capital, managing the investments, and then harvesting the investments. Investment managers may manage multiple funds at different stages, and they often raise or at least prepare to raise a new fund while in the harvesting stage for an old fund.

---

[10] *See, e.g.*, *Mindbody*, 2020 WL 5870084, at *34 (rejecting liquidity-driven conflict theory on a fixed-life investment fund having "a 2018 target date to liquidate its Mindbody investment," which already had passed by the time of the sale); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *19 (rejecting liquidity-driven conflict theory advanced in complaint that alleged that investment firm "usually holds its assets for five years, but has held its interest [the relevant company] for eight" and that the firm's "longer-than normal investment in [the company] reflected the illiquid size of its control block"); *Morton's*, 74 A.3d at 667 (rejecting liquidity-driven conflict theory based on allegation that private equity fund "pressured the board to sell Morton's quickly" so that it could either "get some liquidity to reinvest in its new [fund]" or "cash out the investors in [Morton's] [so that] those investors would have money to reinvest in [the new fund]"); *see also Chen*, 87 A.3d at 671–72 (granting summary judgment after rejecting liquidity-driven conflict theory, which argued that institutional investor supported a near-term sale so that it could wind down a fund that was scheduled to terminate a year earlier).

The desire to wrap up an existing fund or to provide potential investors with attractive realizations while raising a new fund can affect a fund manager's approach to achieving liquidity for an investment.[11] The cyclical process, however, is not so formulaic and structured that the cycle itself would support an inference of a liquidity-based conflict. Instead, this court has reasoned that because investment managers cyclically raise and liquidate funds on a somewhat predictably schedule, the pattern suggests that the monetization phase does not necessarily create a problematic interest. *See Larkin*, 2016 WL 4485447, at *15–16. Here, the plaintiff has not pled facts sufficient to support an inference that Apollo's interest gave rise to a conflict.

Importantly, the complaint seeks to establish an inference not only that Apollo wanted to sell in the near-term, but that Apollo wanted to sell *by the end of 2019*. To support this inference, the plaintiff cites a statement by Apollo that M & A activity for Fund VII likely would take place "in the fourth quarter of 2019." Compl. ¶ 204. The plaintiff alleges that Apollo fixated on this timeframe because Apollo had sold enough of its shares in the secondary market to affect its rights to board control under the stockholders agreement. That agreement gave Apollo the right to designate a number of directors proportionate to

---

[11] *See Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *8–17 (Del. Ch. May 4, 2020) (detailing evidence which established that private equity fund manager instructed its partners to focus on achieving exits and monetizing investments to show returns of capital that would be favorable for raising a new fund); *Trados I*, 2009 WL 2225958, at *2 & n.2, *7 (reviewing internal emails and reports which showed that fund managers wanting to sell quickly to close out a long-held investment so as to focus on other, more promising investments).

its ownership, which historically had enabled Apollo to designate a mathematical majority of the Board. Having sold enough shares to reduce its ownership to 42%, Apollo would have the right to nominate only four of nine directors at the next annual meeting. Absent a sale, the Company's next annual meeting likely would have taken place in November 2019. The plaintiff contends that Apollo wanted to sell while it still had the ability to dictate the outcome.

These allegations do not support a reasonable inference that Apollo wanted to sell by the end of 2019. The comment about M & A activity taking place in the fourth quarter of 2019 is an anodyne statement and does not suggest any improper interest, and the loss-of-control theory is unpersuasive. Although Apollo no longer would designate a mathematical majority of the Board, Apollo still would control 42% of the Company's voting power, appoint four of nine directors, and retain a contractual veto right over any change in the CEO. This potent combination of rights would enable Apollo to maintain effective control over the Company, even without the ability to appoint a mathematical majority of the Board. *See Voigt v. Metcalf*, 2020 WL 614999, at \*18–19 (Del. Ch. Feb. 10, 2020) (discussing different levers of control, including the ability of the holder of a 40% block to exercise voting control).

To bolster its liquidity-driven conflict theory, the plaintiff argues that the facts pled support an inference that Apollo acted consistent with its desire to liquidate. The complaint cites Apollo's extensive sales of over twenty-one million shares in four secondary offerings. Compl. ¶ 34. The plaintiff also alleges that Apollo's sales depressed the stock price, limiting the proceeds that Apollo could generate by that route and causing Apollo to

seek to liquidate its entire interest through a merger. *See id.* ¶¶ 35–36. Although comparable allegations might contribute to an inference that a controller desired liquidity, this particular complaint does not reach that far.

In *Answers*, for instance, the court drew an inference that a 30% stockholder pushed a company toward a sale because it "would only be able to monetize its entire interest if the whole Company were sold." *Answers*, 2012 WL 1253072, at *1. There, the company's common stock was thinly traded, which further limited the blockholder's ability to sell. *Id.* The blockholder took other actions that instantiated its desire for liquidity, such as telling the company's management team that they would be replaced if the company was not sold in the near future. *Id.* at *2. After securing a bid, the board conducted a two-week market check over the December holidays, contrary to the advice of its investment banker. *Id.* The *Answers* complaint also alleged that the company's banker told the board that "time is not a friend to this deal with continued out performance and a looming q4 earnings call." *Id.* at *3. In response, the blockholder pushed the board to speed up the sales process. *Id.*

The *Answers* inference depended on a combination of factors. Here, the plaintiff has tried to argue that a similar combination exists, but the showing remains weak. Apollo's sales in the secondary market provide some support for an inference that Apollo was interested in liquidity, but they also show that Apollo (unlike the large stockholder in *Answers*) obtained significant liquidity through its sales. Since *Answers*, based on factual allegations closer to those in this case, this court held that a large stockholder's history of selling into the market "severely discredit[ed]" any claim that the stockholder's need for

53

liquidity rose to a level sufficient to create a divergent interest. *In re Merge Healthcare*, 2017 WL 395981, at \*8 (Del. Ch. Jan. 30, 2017).

Finally, the plaintiff argues that Apollo demonstrated its liquidity-driven interest by accepting BCP's bid of $16.60 and agreeing to the increased termination fee, rather than allowing the sale process to play out and potentially receive a higher bid from CD&R. The plaintiff argues that a deal with CD&R would have taken longer to close than a deal with BCP, suggesting that Apollo accepted the lower BCP bid to secure a swifter closing. In *Answers*, the court credited allegations that venture capital funds and their board designees rushed to conclude a sale process before the company released financial results that would have harmed the prospects for a sale because the plaintiff relied on specific allegations to support this claim. 2012 WL 1253072, at \*2–3.

Here, the plaintiff argues that Apollo favored the BCP deal because the transaction already was far enough along to obtain CFIUS approval for a closing before the end of 2019. According to the plaintiff, a new deal with CD&R "would re-start the CFIUS approval process and push the closing of [the] transaction into 2020." Compl. ¶ 98. The reality is that CFIUS would not have applied to a deal with CD&R. Under federal law, CFIUS reviews "[a]ny merger, acquisition, or takeover . . . by or with any foreign person that could result in foreign control of any United States business . . . ." 50 U.S.C. § 4565(a)(4)(B)(i). BCP is headquartered in London, so a deal with BCP would result in "foreign control" of the Company and thus required CFIUS approval. CD&R, by contrast, is a Delaware LLC headquartered in New York, so a deal with CD&R would not have

54

triggered this requirement. CFIUS therefore should not have been an impediment to a deal with CD&R and should not have extended the timeline.

The plaintiff objects that when rejecting CD&R's bid and opting for BCP's, the Board cited a condition in CD&R's proposed merger agreement that contemplated CFIUS approval. The plaintiff believes that the defendants should not be allowed to have it both ways, but the two situations are not parallel. The Board could question why CD&R left the CFIUS condition in the merger agreement. The plaintiff, by contrast, relies on CFIUS to make an argument about the timing of the closing that the complaint does not support.

For the reasons discussed later, it is reasonably conceivable that the defendants' actions during the final stage of the sale process fell outside of the range of reasonableness, but it is not reasonably conceivable that Apollo favored a deal with BCP because of a liquidity-driven conflict. Framed differently, it is not reasonable to infer that Apollo sacrificed a higher-priced deal with CD&R that would have closed, at the latest, in early 2020 because of a preference for completing a deal by year-end 2019. If there were other indications that Apollo's desire for liquidity rose to the level of a conflict, then the defendants' behavior during the final stage of the sale process might be corroborative. But the defendants' behavior during the final phase of the sale process, without more, is not so suspicious as to support an inference that Apollo rejected CD&R's bid to take a deal that could close by the end of 2019.

It is possible that a combination of weak indications of a desire for liquidity could add up to a collective picture supporting a reasonable inference of a divergent interest. In this case, however, the plaintiff's allegations, even taken together, do not support a

reasonable inference that Apollo's desire for liquidity was so strong that Apollo would choose to leave money on the table. The allegations against Apollo thus are insufficient to overcome the presumption that Apollo's interests were aligned with those of the stockholders as a whole. Apollo therefore was not a conflicted controlling stockholder, and *Corwin* cleansing is potentially available.

### b. Was The Stockholder Vote Fully Informed?

The plaintiff also seeks to avoid *Corwin* cleansing by pleading facts sufficient to support an inference that the stockholder vote on the Merger was not fully informed. A vote is fully informed when the corporation's disclosures "apprised stockholders of all material information and did not materially mislead them." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote." *Id.* (same). Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (same).

The defendants ultimately bear "the burden of demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction." *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 748 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (ORDER). It is nevertheless "sensible that a plaintiff challenging

the decision . . . first identify a deficiency in the operative disclosure document . . . ." *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017). At that point, "the burden [falls] to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote." *Id.*

At the pleading stage, the operative question is whether the complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison*, 191 A.3d at 282. The resulting inquiry is necessarily "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law." *Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

The allegations of the complaint support a reasonable inference that LionTree tipped BCP about the details of CD&R's bid, including the price. It is reasonably conceivable that the existence of the tip was material information that should have been disclosed to the stockholders. The Proxy made no mention of LionTree's tip to BCP.

The Board learned about the tip during this litigation. On October 29, 2019, the Company filed the Supplement, which stated,

> Also on September 24[,] 2019, as required by the Original Agreement, the Company delivered written notice to Parent of the Presidio Board's determination that [CD&R] and [Sirius] qualified as Excluded Parties. A representative of LionTree also had a conversation with a representative of BC Partners concerning the [CD&R] Proposal, in which the representative of LionTree confirmed that [CD&R]'s Proposal offered a substantial economic improvement over the Merger Consideration, but neither the Company nor its advisors informed Parent or BC Partners of the proposed

57

consideration payable to the Company's stockholders under the [CD&R] Proposal.

Supp. (amending and restating the fifth paragraph on page 31 of the Proxy). Although this disclosure provided some information about the tip, it is reasonable to infer at the pleading stage that it was materially misleading.

The biggest problem with the Supplement is that it stated that LionTree only informed BCP that CD&R's proposal "offered a substantial economic improvement over the Merger Consideration." The complaint's allegations and the documents it references support a reasonable inference that LionTree told BCP that CD&R had offered $16.50, enabling BCP to start work immediately on a revised proposal to acquire the Company for just 10¢ higher than CD&R's offer. It may prove true at a later stage of the case that the Supplement was not materially misleading, but at the pleading stage, the complaint's allegations support a reasonable inference that it was.

A reasonable stockholder would view as important the fact that LionTree provided BCP with CD&R's specific price, enabling BCP to bid just above CD&R's offer rather than having to make a larger move because of uncertainty about CD&R's bid. A reasonable stockholder also would view the disclosure of CD&R's price as important given that CD&R was not told that fact or provided with detailed information about BCP's bid, putting CD&R at a disadvantage. A reasonable stockholder would want to take these facts into account when assessing the adequacy of the sale process and the price it generated.

The Supplement also stated that LionTree had a conversation with BCP *after* the Company delivered written notice of CD&R's proposal. The complaint's allegations and

58

the documents it references indicate that the tip occurred *before* the Company delivered written notice. The defendants try to brush aside the timing as an insignificant detail, but the order of events sheds light on the extent to which LionTree was acting on its own, outside of the process contemplated by the Original Merger Agreement.

The Supplement also created the misleading impression that the Board knew about LionTree's activities in real time, whereas in fact, the Board did not learn about LionTree's tip until discovery during the injunction phase. A reasonable stockholder would view it as important that the Board did not know about LionTree's tip and therefore could not have taken that information into account when negotiating with BCP and CD&R.[12]

As a blanket response to all of the complaint's disclosure-related allegations, the defendants assert that each "was raised and rejected at the preliminary injunction phase." Dkt. 110 at 33. That is true, but the court was then applying a different procedural standard, and the abbreviated discovery that the plaintiff had obtained did not give the court sufficient confidence to issue a preliminary injunction that would put the Merger at risk.

"To obtain a preliminary injunction, a plaintiff must demonstrate . . . a reasonable probability of success on the merits . . . ." *Revlon*, 506 A.2d at 179. Because a preliminary injunction is an "extraordinary remedy," it requires a plaintiff to make a "persuasive

---

[12] *See FrontFour*, 2019 WL 1313408, at *29 ("The Proxy and [the company's] other public filings . . . fail to mention that the Special Committee only learned of these items after the execution of the Merger Agreement (and in some cases only after this litigation began). The timing of the Board's knowledge is a critical fact that would impact any stockholder's assessment of the quality of the transaction process." (footnotes omitted)).

showing" that the injunction should issue. *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998). A court will not issue a preliminary injunction if it cannot "conclude with a degree of confidence that plaintiffs have shown a likelihood of success on the merits . . . ." *Angelo, Gordon & Co. v. Allied Riser Commc'ns Corp.*, 805 A.2d 221, 229 (Del. Ch. 2002).

By contrast, "the threshold for the showing a plaintiff must make to survive a motion to dismiss is low. Delaware is a notice pleading jurisdiction." *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005). On a motion to dismiss, the court applies a plaintiff-friendly standard of review, under which a plaintiff need only establish that its claims are reasonably conceivable. *Central Mortg.*, 27 A.3d at 535.

During the injunction phase, the plaintiff was unable to establish a reasonable probability of success on the merits after obtaining limited discovery in the less-than-two weeks before the injunction hearing. The plaintiff did not receive any discovery from LionTree or Apollo, and the plaintiff received only documents and interrogatory responses from the directors and BCP. The plaintiff did not have the chance to take any depositions. Faced with a sparse record, the court concluded that the evidence was not sufficiently strong to establish a reasonable probability of success on the merits.

To survive a motion to dismiss, the complaint need only plead facts that make it reasonably conceivable that the tip occurred. When applying this standard, the court cannot weigh competing inferences, as it can when assessing the strength of a record during the injunction phase. Instead, the plaintiff is entitled to all reasonable inferences. Under this

standard, the plaintiff's allegations suffice to carry its pleading burden and entitle the plaintiff to discovery.

The injunction ruling also is not dispositive because in denying relief, the court took into account a balancing of the equities. "[A] failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald*, 724 A.2d at 579. The balancing of the equities counseled against enjoining the Merger because by the time of argument, CD&R had walked away, and nothing suggested that an injunction would have caused CD&R to re-engage. Rather than jeopardizing the transaction, the court exercised its discretion to deny the injunction. At this stage of the case, the question is not whether to grant or deny an injunction against a $2.1 billion deal; the question is whether the plaintiff has pled facts supporting a reasonably conceivable inference that the Company's disclosures omitted material information. The complaint clears that hurdle with respect to the tip.

"[O]ne violation is sufficient to prevent application of *Corwin*." *Van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017). The *Corwin* doctrine therefore does not lower the standard of review.

## 2. The *Synthes* Safe Harbor

In *Synthes*, this court held that the controlling stockholder did not have a conflict of interest (and entire fairness review did not apply) when the company engaged in a merger in which all of the company's stockholders received the same consideration. *See* 50 A.3d at 1035; *see also In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *6 (Del. Ch. Sept. 29, 2005). The *Synthes* decision reasoned that the business judgment rule would govern the merger by default, so without a conflicted controller, the court applied

the business judgment rule. *See Synthes*, 50 A.3d at 1033; *see also Morton's*, 74 A.3d at 666 n.53.

The *Synthes* decision stands in contrast with *McMullin v. Beran*, 765 A.2d 910 (Del. 2000), in which the Delaware Supreme Court applied enhanced scrutiny to the sale of a company by a controlling stockholder in which all of the company's stockholders received the same per-share consideration in cash. The Delaware Supreme Court started its analysis by explaining that enhanced scrutiny under *Revlon* would govern a sale of a company for cash in the absence of a controlling stockholder. *Id.* at 918–19. The Delaware Supreme Court then turned to the question presented by the case, which was whether that standard of review applied "in the specific context of evaluating a proposal for a sale of the entire corporation to a third party at the behest of the majority shareholder." *Id.* at 919. The Delaware Supreme Court explained that the same fiduciary principles governed "as if the board itself had decided to sell the corporation to a third party." *Id.* As a result, the controller's decision to sell the company as a whole implicated the "fiduciary duty that was described in *Revlon* and its progeny—to focus on whether shareholder value has been maximized." *Id.* at 920 (footnote omitted); *accord* Mohsen Manesh, *Defined by Dictum: The Geography of* Revlon-*Land in Cash and Mixed Consideration Transactions*, 59 Vill. L. Rev. 1, 24 & n.145 (2014) (noting that *McMullin* "expressly stated that *Revlon* was implicated"). In reaching this conclusion, the Delaware Supreme Court recognized that enhanced scrutiny applies not only when a company that previously lacks a controlling

stockholder is sold to a controller (as in *QVC*), but also when the sale is a "a final-stage transaction for all shareholders."[13]

---

[13] *McMullin*, 765 A.2d at 919. Final-stage transactions give rise to what economists refer to as the last period problem, when the constraints that ordinarily check self-interested action loosen and individuals are more prone to pursue self-interest. *See Reis*, 28 A.3d at 458. For scholarly discussions of this common scenario, see, for example, Ronald J. Gilson & Bernard S. Black, *The Law and Finance of Corporate Acquisitions* 719–21 (2d ed.1995); Stephen M. Bainbridge, Unocal *at 20: Director Primacy in Corporate Takeovers*, 31 Del J. Corp. L. 769, 788–89 (2006); Sean J. Griffith, *The Costs and Benefits of Precommitment: An Appraisal of* Omnicare v. NCS Healthcare, 29 J. Corp. L. 569, 615–16 (2004); Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 Fordham L. Rev. 1899, 1947–53 (2003); Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 Nw. U.L. Rev. 521, 536 (2002). The final-period problem is also "a time when otherwise common behavioral biases may lead to serious deviations from the welfare of the corporation and its shareholders." Griffith, *Deal Protections*, *supra*, at 1948; *see id.* at 1949–53 (discussing overconfidence, over-optimism, groupthink, reactive devaluation, and in-group/out-group thinking). Because potentially subtle conflicts can affect the decisions that fiduciaries make during the last period of play, enhanced scrutiny generally applies to final-stage transactions. *See McMullin*, 765 A.2d at 918 (applying enhanced scrutiny when the board's decision constituted "a final-stage transaction for all shareholders"); *Mindbody*, 2020 WL 5870084, at *13 ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*."); *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13–14 (Del. Ch. Sept. 29, 2016) (explaining that *Revlon* applies in "final stage" transactions because of the inherent conflicts present in such situations); *Chen*, 87 A.3d at 679 ("Delaware decisions have recognized that the standard of review changes to enhanced scrutiny for decisions made during the final period."); *Reis*, 28 A.3d at 458 ("Final stage transactions for stockholders provide another situation where enhanced scrutiny applies."); *Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010) ("In a final stage transaction—be it a cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights—there are sufficient dangers to merit employing enhanced scrutiny. . . ."); *In re Pennaco Energy, Inc. S'holders Litig.*, 787 A.2d 691, 704 (Del. Ch. 2001) (applying enhanced scrutiny to "an end-game transaction that represents the final opportunity for Pennaco's stockholders to realize value from their investment in the company"); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) ("[I]f the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the timeframe for analysis, insofar as those shareholders are concerned, is immediate value maximization."); *see also TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989)

The *McMullin* decision thus applied enhanced scrutiny to a controller's decision to sell its controlled subsidiary, even in a transaction in which the controller and all other stockholders received the same transaction. "There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its answer." *In re MFW S'holders Litig.*, 67 A.3d 496, 520 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014). As

---

(reasoning that *Revlon* applies to a cash sale because "[i]n the setting of a sale of a company for cash, the board's duty to shareholders is inconsistent with acts not designed to maximize present share value, acts which in other circumstances might be accounted for or justified by reference to the long run interest of shareholders. In such a setting, for the present shareholders, there is no long run." (footnote omitted)). *See generally* J. Travis Laster, Revlon *Is a Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5 (2013) (grounding enhanced scrutiny in the conflicts present in final-period transactions); Morgan White-Smith, *Revisiting* Revlon*: Should Judicial Scrutiny of Mergers Depend on the Method of Payment?*, 79 U. Chi. L. Rev. 1177 (2012) (discussing final-stage rationale for enhanced scrutiny); Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J. Corp. L. 583, 589–602 (1994) (arguing that enhanced scrutiny should apply when stockholders no longer have the ability to reverse the board's decision by electing new directors).

Viewed from the standpoint of the final period problem, the change-of-control test from *QVC* emerges as a derivative test which recognizes that once control is sold, the new controlling stockholder has the power to effectuate a final-stage transaction. *See QVC*, 637 A.2d at 43 (noting that after a sale of control, "there will be a controlling stockholder who will have the voting power to: (a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public stockholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; or (g) otherwise alter materially the nature of the corporation and the public stockholders' interests"); *id.* at 45 (justifying application of enhanced scrutiny because of, among other factors, "the threatened diminution of the current stockholders' voting power . . . [and] the traditional concern of Delaware courts for actions which impair or impede stockholder voting rights"). The overarching test is whether the transaction constitutes a final-stage transaction for the stockholders in that entity.

between the Delaware Supreme Court's decision in *McMullin* and this court's decision in *Synthes*, the former is controlling.

The Delaware Supreme Court's application of enhanced scrutiny in *McMullin* comports with the general proposition that "when a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation." *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990) (Allen, C.) (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952)). As a result, the actions of a controlling stockholder "must be tested by those same standards of fiduciary duty which directors must observe in their relations with all their stockholders." *Lynch v. Vickers Energy Corp.*, 351 A.2d 570, 573 (Del. Ch. 1976), *aff'd in pertinent part, rev'd on other grounds*, 383 A.2d 278, 281 (Del. 1977). Chancellor Josiah Wolcott explained this principle in the court's seminal decision on the fiduciary duties of a controlling stockholder:

> The same considerations of fundamental justice which impose a fiduciary character upon the relationship of the directors to the stockholders will also impose, in a proper case, a like character upon the relationship which the majority of the stockholders bear to the minority. When, in the conduct of the corporate business, a majority of the voting power in the corporation join hands in imposing its policy upon all, it is beyond all reason and contrary, it seems to me, to the plainest dictates of what is just and right, to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders. Ordinarily the directors speak for and determine the policy of the corporation. When the majority of stockholders do this, they are, for the moment, the corporation. Unless the majority in such case are to be regarded as owing a duty to the minority such as is owed by the directors to all, then the minority are in a situation that exposes them to the grossest frauds and subjects them to most outrageous wrongs.

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491 (Del. Ch. 1923) (collecting authorities); *accord Epstein v. Celotex Corp.*, 238 A.2d 843, 847 (Del. Ch. 1968); *see* 18 C.J.S. *Corporations* § 394 ("When a stockholder exercises control over the corporation by directing its actions, the stockholder assumes the same fiduciary duties as those owed by a director to the corporation."). It follows that just as enhanced scrutiny governs the actions of directors when they undertake a sale of the corporation, the same standard applies to the actions of controlling stockholders in that scenario.

Following *McMullin* and applying enhanced scrutiny as the baseline standard of review in this situation also recognizes that law has developed since *Synthes* sought to create a safe harbor for controlling stockholder transactions. Most notably, the Delaware Supreme Court issued its decision in *Corwin*, under which a controlling stockholder can obtain pleading-stage business judgment deference by accepting the same consideration that other stockholders receive *and* obtaining approval for the transaction from a fully informed, uncoerced majority of the disinterested shares. *Corwin*, 125 A.3d at 312. Maintaining the *Synthes* safe harbor would conflict with *Corwin* by bestowing the protections of the business judgment rule without the fully informed stockholder vote that *Corwin* deemed crucial.

Following *McMullin* and applying enhanced scrutiny as the presumptive standard of review absent *Corwin* cleansing does not require jettisoning the core holding of *Synthes*, which was that entire fairness did not apply to a controlling stockholder transaction unless the controller either (i) stood on both sides of the transaction or (ii) used the transaction to extract a benefit not shared by the stockholders as a whole. Because Apollo did not stand

on both sides of the transaction and received the same consideration as all other stockholders, entire fairness does not provide the operative standard of review.

Following *McMullin* also does not require also abandoning a central teaching of *Synthes*, which is that when a controller receives the same pro rata consideration as other stockholders, a court should be reluctant to second guess the transactional outcome in the transactional justification context or to allow a complaint that seeks to impose liability on the controller to get past the pleading stage in a liability setting. Applying enhanced scrutiny as the transactional standard of review does not alter the premise that "investors act to maximize the value of their own investments." *Chen*, 87 A.3d at 670 (internal quotation marks omitted). It remains likely that a controller will bargain for the highest value that it can get for its shares, making it equally likely that the resulting transaction represents the best deal reasonably available for all stockholders. A court can give heavy weight to the views of an aligned controller in denying transaction-related relief (as the court previously did during the injunction phase) or when holding that the complaint fails to state a claim against the controller (as in this decision).

By contrast, following *McMullin* and applying enhanced scrutiny preserves a plaintiff's ability to challenge—and a court's ability to review—a case in which it appears that self-interest may have tainted the sale process. Here, it is reasonably conceivable that self-interest tainted the sale process, although Apollo was not the source.

## C.      The Sale Process Under Enhanced Scrutiny

Because *Corwin* cleansing and the *Synthes* safe harbor do not apply, enhanced scrutiny provides the governing standard of review. The complaint's allegations support a reasonable inference that the sale process fell outside the range of reasonableness.

### 1.      A Deeper Dive Into Enhanced Scrutiny

Enhanced scrutiny asks whether the directors conduct fell within a range of reasonableness. "What typically drives a finding of unreasonableness is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process." *Del Monte*, 25 A.3d at 831. "[W]hen there is a reason to conclude that debatable tactical decisions were motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated." *El Paso*, 41 A.3d at 439.

The actions of senior officers, deal advisors, and other participants in the sale process often play a significant role in enhanced scrutiny analysis. Then-Vice Chancellor Strine wrote that "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price." *Toys "R" Us*, 877 A.2d at 1002. Vice Chancellor McCormick recently reframed this observation more broadly to state that "the paradigmatic *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal

interests in ways inconsistent with maximizing stockholder value." *Mindbody*, 2020 WL 5870084, at *13. Because the relevant actors may be non-fiduciaries, such as deal advisors, this statement could be broadened further to refer to a *conflicted actor* "who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value." *Id.*

The allegations of the complaint support a reasonable inference that LionTree and Cagnazzi steered the sale process toward a deal with BCP and away from CD&R. LionTree and Cagnazzi both had self-interested reasons to secure a transaction with BCP.

Cagnazzi's reasons were more obvious and straightforward: BCP would retain Cagnazzi as CEO and allow him to roll over the bulk of his shares. Cagnazzi's brothers would keep their jobs as well. Delaware law recognizes that management's prospect of future employment can give rise to a disabling conflict in the sale context. *See Mindbody*, 2020 WL 5870084, at *15 (collecting authorities).

LionTree's interests were more subtle, but no less self-interested. LionTree benefitted from focusing on a transaction that would earn LionTree its fee, benefit one private equity firm with which it had an established relationship (BCP), satisfy another private equity firm with which it had an established relationship (Apollo), and further the interests of a CEO with whom it had an established relationship (Cagnazzi). Pushing for a competitive process involving CD&R might earn LionTree a little more money in the short run through its contingent fee, but it would not serve LionTree's interests in the long run. If CD&R won the bid, then the Company would have a new owner, a new management team, and no incumbent relationship with LionTree. Meanwhile, people with whom

69

LionTree had existing relationships would be disappointed. It is reasonably conceivable that for LionTree, steering the deal to BCP was the winning solution.[14]

Absent divergent interests, the Board's sale process in this case would fall within a range of reasonableness. The Board combined a narrow, pre-signing canvass with a post-signing market check. *See PLX*, 2018 WL 5018535, at *44. That generally is a reasonable approach. *See C & J Energy Servs., Inc. v. Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.,* 107 A.3d 1049, 1067–68 (Del. 2014). Here, however, it is reasonably conceivable that the sale process fell outside the range of reasonableness because LionTree and Cagnazzi steered the Company into a deal with BCP. It is also reasonably conceivable that the Board's supervision of its financial advisor fell outside the range of reasonableness.

### 2.     The Tip

The principal defect in the sale process was LionTree's undisclosed tip to BCP. In the iconic case of *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261 (Del. 1989), the Delaware Supreme Court addressed a situation in which two members of company

---

[14] There was also the risk that if a bidding war ensued and BCP had to pay a significantly higher price, then BCP and Cagnazzi would not be as happy with the result. As a buyer, BCP's interest lay in paying as little as possible. As a net buyer through the roll-over of his equity, Cagnazzi shared that interest. *See In re Dunkin' Donuts S'holders Litig.,* 1990 WL 189120, at *9 (Del. Ch. Nov. 27, 1990) ("A bidder's objective is to identify an underpriced corporation and to acquire it at the lowest price possible. ... The downside, for bidders, is that the price may get 'bid up' in the heat of the auction, thereby decreasing the expected profit from the investment.").

management—Evans and Reilly—tipped one of the participants in the sale process—the private equity fund KKR—by providing the specific price of the competing bidder's offer. KKR used the information to determine the price of its next bid and to demand additional deal protection in the form of an asset lockup. The executives and the company's investment banker knowingly concealed the tip from the board. *Id.* at 1282.

The Delaware Supreme Court had little difficulty holding that the tip and its concealment tainted the sale process. The high court explained that when directors rely on information from officers and other experts, "they necessarily do so on the presumption that the information provided is both accurate and complete." *Id.* at 1283–84. The high court observed that when a board has been misled, the resulting decisions "are voidable at the behest of innocent parties to whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected." *Id.*

Based on the complaint, the tip in this case was similar to the tip in *Macmillan*. The factual allegations of the complaint support a reasonable inference that LionTree informed BCP of the specific price of CD&R's bid, even though the Original Merger Agreement only entitled BCP to learn the identity of the Excluded Party, and even though CD&R's offer letter stated that its bid would be withdrawn if any information other than its identity was disclosed to BCP. As in *Macmillan*, LionTree concealed its tip from the Board, which did not learn of the tip until this litigation. As in *Macmillan*, BCP used the tip to structure its bid and demand additional deal protection in the form of an increased termination fee.

To minimize the relative import of LionTree's tip, the defendants observe that in *Macmillan*, the tippers were Evans and Reilly, two executives who were part of a buyout

group with KKR. In this case, the tipper was LionTree, the Company's financial advisor. That is not a material difference. The Delaware Supreme Court in *Macmillan* also criticized a script that the company's financial advisor used to communicate with KKR, describing it as "in reality another form of tip." *Id.* at 1283. The *Macmillan* case thus also involved tipping by a financial advisor.

The *Macmillan* case is also analogous because Cagnazzi had agreed with BCP on the terms for rolling over two-thirds of his equity and running the post-buyout company. Cagnazzi thus was situated similarly to Evans and Reilly.

The defendants argue that the LionTree tip was immaterial, even beneficial, because it induced BCP to offer $16.60 per share and did not preclude CD&R from continuing to bid. The Delaware Supreme Court rejected a similar argument in *Macmillan*, noting that "the tip provided vital information to enable KKR to prevail." *Id.* at 1283. In reaching this conclusion, the Delaware Supreme Court observed that the tip provided the precise information that KKR needed to price its bid and demand an asset lockup, resulting in "the very improvements upon which the board subsequently accepted the KKR bid . . . ." *Id.*

The same reasoning applies here. It is reasonable to infer that by sharing CD&R's price, LionTree provided vital information that enabled BCP to price its bid just 10¢ over CD&R's offer and demand an increased termination fee. That combination of demands brought the sale process to an end. The fact that LionTree's tip resulted in an increased bid does not mean that it did not taint the sale process. Without the tip, uncertainty about CD&R's offer could have led BCP to counter at a higher price—$16.75 or $17.00, maybe more—in an effort to preempt CD&R. Or BCP might have bid at or below CD&R's price,

72

leading to an active bidding contest. CD&R had indicated that it anticipated being able to raise its offer to at least $17.00 per share, and BCP had analyzed prices at least that high, so the bidding might readily have reached those levels.

LionTree's tip foreclosed these possibilities. The tip enabled BCP to craft a bid that would deprive CD&R of the principal benefit of Excluded Party status. BCP's bid also put the Board in a bind because agreeing to BCP's conditions would change the rules of the game. CD&R told the Board that it likely would walk away if the rules were changed. LionTree's tip thus put the Board in a compromised position.

LionTree then made matters worse by concealing the tip from the Board. It is reasonable to infer that by not telling the Board about its tip to BCP, LionTree prevented the Board from taking action to neutralize the effect of the tip and facilitate an active bidding contest. "No one can tell what would have happened. . . . That is beyond the capacity of humans." *El Paso*, 41 A.3d at 447. But it is reasonable to infer that the "process would have played out differently." *Del Monte*, 25 A.3d at 833. LionTree's tip resulted in a process that, at the pleading stage, falls short of enhanced scrutiny.

### 3.    The Sale Process In Light Of The Tip

LionTree's tip casts a dim light on the sale process as a whole. Determining how to obtain the best transaction reasonably available is a complex task. Among other things, a board and its advisors must balance the value of pre-signing competition against the benefits of working with a single bidder to establish a price floor and then exposing the transaction to post-signing competition. "The board of directors is the corporate decisionmaking body best equipped to make these judgments." *QVC*, 637 A.2d at 45.

73

In this case, the Board made the decision to negotiate only with BCP and then expose the transaction to post-signing competition. When countering BCP's original offer of $15.60 per share, the Board informed BCP that the transaction agreement would require a "robust 'go-shop.'" Compl. ¶ 68. BCP agreed, and the Original Merger Agreement included the Go-Shop Provision, which divided the post-signing period into a Go-Shop Phase and a No-Shop Phase. During the Go-Shop Phase, the Company and its advisors could engage in proactive outreach to, provide information to, and negotiate with potential bidders. The Company was not obligated to provide BCP with information about the bidders or their proposals; the Company only was required to inform BCP of the identity of any Excluded Party.

Under the Original Merger Agreement, an Excluded Party gained two significant advantages. First, the Excluded Party could continue negotiating with the Company for another ten days after No-Shop Period Start Date. During this ten-day period, the Company was not obligated to provide any information to BCP beyond the Excluded Party's identity. Second, an Excluded Party could negotiate a deal that would require the Company to pay BCP a termination fee of $18 million rather than $40 million.

It is reasonable to infer that the Board approved the Original Merger Agreement believing that it represented the best means to obtain the best transaction reasonably available. But after BCP made its new proposal on September 24, 2019, the Board abandoned this structure and tilted the process in favor of BCP.

The Board did so in two ways. First, the Board operated within the timeframe imposed by BCP's exploding offer, insisting that CD&R materially strengthen its bid by

5:00 p.m. on September 25, 2019. Rather than having another eight days and seven hours to negotiate with the Company and submit a definitive proposal, CD&R had only twenty hours. The short fuse curtailed one of the benefits of Excluded Party status.

Second, even though CD&R responded within the Board's timeframe, indicated that it could increase its bid to $17.00 per share, and objected to the changes in the process, the Board accepted BCP's proposal and increased the termination fee to $40 million. This change eliminated the other benefit of Excluded Party status. CD&R had informed the Company that this change "would in all likelihood result in the termination of our continued pursuit of the Company." Compl. ¶ 132. When the Company announced the Amended Merger Agreement, CD&R walked, just as it said it would.

By agreeing to BCP's terms and increasing the termination fee, the Board tilted the sale process in favor of BCP and against CD&R. A board of directors may favor a bidder if "in good faith and advisedly it believes shareholder interests would be thereby advanced." *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988) (Allen, C.). "[A] board may not favor one bidder over another for selfish or inappropriate reasons . . . ." *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *14 (Del. Ch. Dec. 10, 1998). "[A]ny favoritism [directors] display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares." *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007). A board "may tilt the playing field if, but only if, it is in the shareholders' interest to do so." *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 782 (Del. Ch. 1988). By contrast, "[w]hen directors bias the process against one bidder and toward another not in a

75

reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty." *Topps*, 926 A.2d at 64.

Viewed in the abstract, the decision to accept BCP's offer of $16.60 per share and favor BCP by requiring an Excluded Party to pay an increased termination fee would be the type of debatable tactical decision that a board and its advisors are entitled to make. A board has an unremitting fiduciary obligation to adjust its strategy as circumstances unfold if it believes in good faith that the change is in the best interest of the corporation and its stockholders. *See In re Rural Metro Corp.*, 88 A.3d 54, 93 (Del. Ch. 2014) (evaluating in post-trial decision whether the board's decision to continue with its original strategy, despite feedback that the strategy was not working, fell within the range of reasonableness), *aff'd sub nom. RBC*, 129 A.3d 816. The Board had to evaluate BCP's exploding offer and determine how to respond, including by assessing the risk that CD&R would walk away. Generally, that is a task best left to directors and their advisors, not to the reviewing court. In this case, however, the factual allegations of the complaint support a reasonable inference that the Board's decisions "tilt[ed] the process toward the bidder more likely to continue current management." *Topps*, 926 A.2d at 64.

Other aspects of the sale process that ordinarily would not take on meaningful significance contribute to this inference. The Board's contemporaneous criticisms of CD&R's offer have an air of pretext. *See* Part I.M, *supra*. The Board's objection that CD&R's offer was not legally binding and that CD&R did not yet have committed financing essentially attacked the design of the Go-Shop Phase that the Board and its

advisors had crafted. Under the terms of the Go-Shop Provision, CD&R did not have to make a legally binding offer or have committed financing. CD&R had shown that it was a serious bidder, including by providing a commitment letter from Credit Suisse. CD&R was supposed to have another eight days to finalize its bid. The Board also expressed concern about a CFIUS filing, but Company counsel did not believe a CFIUS filing would be required for a deal with CD&R.

The June 5 Meeting also takes on greater salience. The complaint supports a reasonable inference that Stenzler and Cagnazzi did not provide the Board with a meaningful report on the June 5 Meeting before the Board decided at the July 8 Meeting to engage only with BCP during the pre-signing phase. The first reference to the June 5 Meeting appears in LionTree's presentation for a meeting of the Board on July 22, after the Board had decided to engage with BCP and after BCP had made its initial offer. Even then, LionTree's presentation materials stated only that "[s]ubsequent to that initial introduction [between Apollo and CD&R], a follow up introduction was made between representatives of CD&R and [Cagnazzi]." Dkt. 110 Ex. 3 at '209.

Other aspects of LionTree's behavior also come into focus. LionTree's belated disclosure of its relationships becomes corroborating evidence of a lack of candor. And Stenzler's success in convincing Cagnazzi to increase LionTree's fee becomes corroborative evidence of self-interest.

Without the tip, the sale process as a whole would fall within a range of reasonableness. With the tip, the sale process must be viewed in a different light. Taken as a whole, the complaint's allegations support an inference that the Board's tactical decisions

did not rest on an informational base that allowed the directors to make a principled evaluation of the risks and benefits to the Company's stockholders, but rather rested on an informational base shaped by LionTree and Cagnazzi's consideration of their own financial and personal interests. These factual allegations implicate "the core animating principle of *Revlon*." *El Paso*, 41 A.3d at 439.

### 4. Banker Oversight

The complaint's allegations support an inference that the Board failed to act within the range of reasonableness in supervising LionTree. One of the Delaware Supreme Court's clearest teachings is that "directors cannot be passive instrumentalities during merger proceedings." *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II)*, 634 A.2d 345, 368 (Del. 1993). "[A] board of directors . . . may not avoid its active and direct duty of oversight in a matter as significant as the sale of [a corporation.]" *Macmillan*, 559 A.2d at 1281; *accord Citron*, 569 A.2d at 66. Directors must maintain "an active and direct role in the context of a sale of a company from beginning to end." *Technicolor Plenary II*, 634 A.2d at 368.

"[P]art of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors." *Rural Metro*, 88 A.3d at 90. "Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the investment banker's compensation structure, relationships, and potential conflicts." *Id.* "[D]irectors need to be active and reasonably informed when overseeing the sale process, including identifying

78

and responding to actual or potential conflicts of interest." *RBC*, 129 A.3d at 855. When relying on an advisor that faces conflicts of interest, "the board should require disclosure of, on an ongoing basis, material information that might impact the board's process." *Id.* at 856.

The complaint's allegations support a reasonable inference that the Board did not make a meaningful effort to oversee LionTree. The Board did not receive any disclosures from LionTree about its relationships and potential conflicts of interest until August 1, 2019. By that time, LionTree had been acting as the Company's principal point of contact with BCP since July 8, 2019, and the parties had reached agreement on price on July 24. The Board did not meet to consider LionTree's relationships and potential conflicts until August 5, and the Board's review appears to have consisted exclusively of asking Stenzler whether the fees that LionTree received were material to the firm. The Board did not approve the terms of LionTree's engagement until the two-day meeting on August 12 and 13—the same meeting during which the Board approved the Original Merger Agreement. On August 12, the Board approved a success fee for LionTree equal to 1.5% of the transaction value. Stenzler then spoke with Cagnazzi, and the next day Cagnazzi convinced the Board to increase LionTree's fee to 1.575% of the transaction value. During the same meeting, the Board signed off on LionTree's engagement letter. At the pleading stage, it is reasonable to infer that the Board's actions fell outside the range of reasonableness because the Board failed to provide active and direct oversight of LionTree.

**5.** **The Complaint's Allegations Support An Inference Of Fiduciary Breach.**

At the pleading stage, it is reasonably conceivable that "the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision" fell outside the range of reasonableness. *See QVC*, 637 A.2d at 45. The complaint therefore pleads a breach of duty in connection with the sale process.

To state what should be obvious, the court is not holding that the sale process fell outside the range of reasonableness, nor is it finding that the directors breached their fiduciary duties. The court is holding only that the complaint's allegations support a reasonable inference that the sale process fell outside the range of reasonableness and that the directors could have breached their fiduciary duties.

**D.** **The Claim For Damages Against LionTree**

The plaintiff's strongest claim for damages is against LionTree for aiding and abetting a breach of fiduciary duty. Construing the allegations in the plaintiff's favor, as the court must at this stage, the complaint supports a reasonable inference that LionTree manipulated the sale process by tipping BCP about CD&R's bid and providing the Board with a misleading picture about the level of CD&R's interest after the June 5 Meeting. Together with LionTree's belated disclosure to the Board about its relationships and the last-minute agreement by LionTree and Cagnazzi to increase LionTree's success fee, these allegations support a pleading-stage inference that LionTree sought to earn its fee by delivering the transaction that BCP and Cagnazzi wanted, at a price that was acceptable to

80

Apollo, rather than striving to assist the Board in obtaining the best transaction reasonably available for all of the Company's stockholders.

The plaintiff has framed its claim against LionTree as a claim for secondary liability based on aiding and abetting a breach of fiduciary duty by the Board. To plead a reasonably conceivable claim, the complaint must allege facts addressing four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach. *Malpiede*, 780 A.2d at 1096. The complaint pleads facts to support each of these elements.[15]

---

[15] Assuming for the sake of argument that the business judgment rule governed the Merger such that it was not reasonably conceivable that the fiduciary defendants committed a breach of duty, the complaint still would state a claim for relief against LionTree. Rather than a claim for secondary liability under a theory of aiding and abetting, the pled facts would support a claim for primary liability under a theory of fraud on the board. *See* Joel Edan Friedlander*, Confronting the Problem of Fraud on the Board*, 75 Bus. Law. 1441 (2020).

In my view, to plead a claim for the equitable tort of fraud on the board, a stockholder plaintiff must plead elements resembling a claim for common law fraud. Under Delaware law, a claim for fraud requires (i) a false statement, the deliberate concealment of a material fact, or the failure to provide information necessary to prevent a statement from being materially misleading, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages suffered by the plaintiff. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). For fraud on the board, the element of reliance changes. Rather than pleading that the plaintiff reasonably relied on the representation, the plaintiff must plead that the board reasonably relied on the representation.

The complaint here pleads all of the necessary elements. Assuming without deciding that the claim sounds in fraud such that a plaintiff would have to plead "the circumstances

81

## 1. The Existence Of A Fiduciary Relationship

The complaint easily pleads the existence of a fiduciary relationship. Indeed, it adequately pleads the existence of three.

"[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders." *Macmillan*, 559 A.2d at 1280 (citations omitted). The Company's directors were fiduciaries who owed duties to the corporation and its stockholders.

"[O]fficers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty." *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009). As an officer, Cagnazzi was a fiduciary who owed duties to the corporation and its stockholders.

A stockholder owes fiduciary duties when it controls the corporation, either through ownership of a majority of the corporation's voting power or by exercising actual control

---

constituting fraud" with particularity under Rule 9(b), the complaint's allegations more than satisfy the particularity standard.

Students of corporate law will wonder whether a claim for fraud on the board is derivative or direct under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Just as claims for fiduciary duty (including claims for breach of the duty of disclosure) can be derivative, direct, or both, so too it seems likely that depending on the *Tooley* test, a claim for fraud on the board could be derivative, direct, or both. Without delving into the nuances, doctrinal and policy considerations suggest that in a challenge to a merger such as this one, the claim would be direct. In summary, the current transaction is a merger in which the stockholders received cash for their shares. Under *Tooley*, the stockholders suffered injury in the form of a lower transaction price, and any remedy logically would go to the stockholders as a class. In substance, the plaintiff is challenging the Merger and the process that led to a transaction that converted each of the shares into a right to receive $16.60, not events that took place before the merger and affected the Company as an entity. *See Morris v. Spectra Energy P'rs (DE) GP*, 2021 WL 221987, at *4–8, --- A.3d --- (Del. Jan. 22, 2021). These considerations warrant characterizing the claim as direct rather than derivative.

82

over the corporation's affairs. *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994). It is undisputed for purposes of the motion to dismiss that Apollo was a controlling stockholder. As such, Apollo was a fiduciary who owed duties to the corporation and its unaffiliated stockholders.

## 2. A Breach Of Duty

The complaint pleads allegations supporting a reasonable inference that the fiduciary defendants breached their duties. When a plaintiff seeks to plead a breach of fiduciary duty for purposes of an aiding and abetting claim, the plaintiff is not seeking to impose monetary damages on a fiduciary defendant. Accordingly, if a higher standard of review governs, such as enhanced scrutiny or entire fairness, then the question of breach is evaluated using the higher standard. *See RBC*, 129 A.3d at 857. "[A]n advisor whose bad-faith actions cause its board clients to breach their situational fiduciary duties (*e.g.*, the duties *Revlon* imposes in a change-of-control transaction) is liable for aiding and abetting." *Singh*, 137 A.3d at 153.

This decision already has concluded that the complaint states a claim that the fiduciary defendants' actions fell outside the range of reasonableness for purposes of enhanced scrutiny. The second element of an aiding-and-abetting claim is satisfied.

## 3. Knowing Participation In The Breach

The third element of a claim for aiding and abetting is the defendant's knowing participation in the breach. This element protects the alleged aider and abettor by ensuring that the alleged aider and abettor still will not face potential liability absent pled facts that support an inference of *scienter*. As the Delaware Supreme Court has explained,

83

Delaware has provided advisors with a high degree of insulation from liability by employing a defendant-friendly standard that requires plaintiffs to prove scienter and awards advisors an effective immunity from due-care liability. . . . In fact, most professionals face liability under a standard involving mere negligence, not the second highest state of scienter—knowledge—in the model penal code.

*Singh*, 137 A.3d at 152–53. "[T]he requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove." *RBC*, 129 A.3d at 865–66.

The element of knowing participation involves two concepts: knowledge and participation. To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RBC*, 129 A.3d at 862 (internal quotation marks omitted). "[T]he question of whether a defendant acted with *scienter* is a factual determination." *Id.* Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity." *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014). For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge. *See id.*; *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

To satisfy the requirement of participation, a plaintiff can plead that the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue." *Malpiede*, 780 A.2d at 1098. In particular, a third

party can participate in a fiduciary breach by facilitating or inducing a breach of the duty of care. *PLX*, 2018 WL 5018535, at \*48. A third party may facilitate a breach by misleading the fiduciary with false or materially misleading information.[16] Or a third party can facilitate a breach by withholding information in a manner that misleads the fiduciary on a material point.[17]

---

[16] *See Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at \*28 (Del. Ch. Jan. 25, 1999) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 322 n.3 (Del. Ch. 2013) (noting that "a non-fiduciary aider and abetter" could be exposed to liability "if, for example, the non-fiduciary misled unwitting directors to achieve a desired result").

[17] *See Macmillan*, 559 A.2d at 1283–84, 1284 n.33 (describing management's knowing silence about a tip as "a fraud upon the Board"); *FrontFour*, 2019 WL 1313408, at \*26 ("In the events leading up to the Proposed Transaction, the Taube brothers created an informational vacuum, which they then exploited."); *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at \*15 (Del. Ch. Aug. 29, 2018) (sustaining claim for aiding and abetting against financial advisor for preparing misleading analyses and creating an informational vacuum that misled board); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at \*25 (Del. Ch. Oct. 20, 2015) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at \*48 (Del. Ch. Sept. 4, 2014) (holding that interested director aided and abetted breach of duty by failing to adequately explain valuation, thereby misleading the board), *aff'd sub nom.*, *Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015) (ORDER); *Rural Metro*, 88 A.3d at 99 (holding that investment banker knowingly participated in board's breach of duty where "RBC *created* the unreasonable process and informational gaps that led to the Board's breach of duty" (emphasis in original)); *Del Monte*, 25 A.3d at 836–37 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board). *Cf. Technicolor Plenary III*, 663 A.2d at 1170 n.25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body."); *El Paso*, 41 A.3d at 443 ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business.").

Consistent with these principles, the *Restatement (Second) of Torts* explains that a defendant can be secondarily liable for "harm resulting . . . from the tortious conduct of another" if the defendant

    (a)    does a tortious act in concert with the other or pursuant to a common design with him, or

    (b)    knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

    (c)    gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement (Second) of Torts* § 876 (1979). A comment on clause (b) states: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. *Id.* cmt. d. Under the *Restatement*, giving "substantial assistance or encouragement" to the fiduciary in breaching its duty is sufficient to satisfy the participation requirement.

As discussed previously, the complaint supports a reasonable inference that LionTree withheld information from the Board about the June 5 Meeting and LionTree's tip. It is reasonably conceivable that by withholding this information, LionTree misled the Board about material facts, creating an informational vacuum that caused the Board to breach its duty of care.

The defendants respond that "[t]o show that a financial advisor acted with *scienter*, a stockholder plaintiff typically points to evidence of a conflict of interest diverting the advisor's loyalties from its client." *Rural Metro*, 88 A.3d at 100. In other words, there

86

typically is a motive. The defendants argue that LionTree did not have a motive to mislead anyone because it did not have the type of blatant buy-side conflict of interest present in *RBC*, *Del Monte*, and *El Paso*.

The ruling in *RBC* was a post-trial decision. The decisions in *Del Monte* and *El Paso* were preliminary injunction decisions rendered after extensive, albeit expedited discovery, which the plaintiff did not obtain here. This case is currently at the pleading stage, meaning that the plaintiff need only plead facts supporting an inference of knowledge. A plaintiff does not have to plead evidence.[18] Nor does a plaintiff have to negate other possible inferences.[19] Such a pleading standard would require a plaintiff to do more to survive a

---

[18] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) ("[U]nder Delaware's judicial system of notice pleading, a plaintiff need not plead evidence. Rather, the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted."); *Brehm*, 746 A.2d at 254 (explaining that even under a pleading standard that requires particularized allegations, "the pleader is not required to plead evidence"); *Taggart v. George B. Booker & Co.*, 35 A.2d 499, 500–01 (Del. Super. 1943) ("Generally it is not necessary to plead evidence; and the rule requiring particularity is relaxed where the matter is peculiarly within the knowledge of the complaining party. A pleading is sufficient if it is intelligible to a person of ordinary understanding and affords him, the court and the jury the means of determining what is intended.").

[19] *See Kahn v. Stern*, 2018 WL 1341719, at *1 ("[T]o the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement as well."); *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 258–60 (Del. 2017) ("Relying on *Parnes v. Bally Entertainment Corporation*, and corporate notions of waste, we held [in *Brinkerhoff III*] that to state a claim based on bad faith, [the general partner's] decision to enter into the Joint Venture Transaction must be so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith. . . . [W]e depart from [that] decision . . . and hold that to plead a claim that [the general partner] did not act in good faith, [the plaintiff] must plead facts supporting an inference that [the

87

motion to dismiss than a plaintiff must do to prevail at trial. At that point, after discovery,

a plaintiff need not prove that the evidence uniformly establishes knowledge and that no

other inference is possible; the plaintiff need only establish knowledge by a preponderance

of the evidence.[20]

It is also important to remember that parties who engaged in duplicitous activity do

not generally advertise their actions or motives, which may not be readily apparent from

the surface facts. As Chancellor Allen trenchantly observed,

> [O]ne's view concerning bona fides, will, in settings such as this, almost always rest upon inferences that can be drawn from decisions made or courses of actions pursued by the board (or a Special Committee). Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable. Here, there are aspects that supply a suspicious mind with fuel to feed its flame.

---

general partner] did not reasonably believe that the . . . transaction was in the best interests of the Partnership.") (internal quotations omitted).

[20] *See Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009) (holding defendant liable for aiding and abetting; "Based on the record, I find that Triton also has proven by a preponderance of the evidence that Defendants Elliott and Eastern knew about Kirk's actions and participated in them."), *aff'd*, 988 A.2d 938 (Del. 2010); *Smith v. Smitty McGee's Inc.*, 1998 WL 246681, at *3 (Del. Ch. May 8, 1998) ("Plaintiff may ultimately fail to prove knowing participation by a preponderance of the evidence at trial, but accepting the truth of all well-pleaded allegations of the complaint and construing all inferences to be drawn from those facts in the light most favorable to plaintiff, I cannot now say that there is no set of circumstances under which plaintiff would be entitled to relief.").

*Fort Howard*, 1988 WL 83147, at \*12. *Cf. In re Am. Intern. Gp., Inc.*, 965 A.2d 763, 796 (Del. Ch. 2009) ("[T]hose who engage in sophisticated forms of financial fraud do their best not to leave an obvious paper trail. Rather, consistent with their improper objectives, [they] try to conceal their roles and not leave marked paths leading to their doorsteps."), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (ORDER).

This court has held that a complaint stated a claim for aiding and abetting against a financial advisor in connection with a management buyout where the complaint pled claims for breach of duty against the directors, where the financial advisor had "early involvement with the management group" and had "involvement with the special committee," and where the advisor was "present and active at the management meeting at which it was decided to concentrate on the [management-affiliated offer]." *In re Shoe-Town Inc. S'holders Litig.*, 1990 WL 13475, at \*8 (Del. Ch. Feb. 12, 1990). The complaint in this case pleads similar facts and more regarding LionTree's involvement in the sale process.

Regardless, in this case, the pled facts support a reasonable inference of motive. Delaware law recognizes that the business interests of contingently compensated deal advisors who are repeat players in the industry can diverge from the interests of the stockholders as a whole in maximizing the sale price on a particular deal.

> Although a contingent compensation arrangement that pays an agent a percentage of deal value generally will align the interests of the agent in getting more compensation with the principal's desire to obtain the best value, the interests of the agent and principal diverge over whether to take the deal in the first place. The agent only gets paid if the deal happens, but for the principal, the best value may be not doing the deal at all. The same divergent interests play out on a smaller scale during final negotiations over

price. The contingently compensated agent has a greater incentive to get the deal done rather than push for the last quarter, particularly if pushing too hard might jeopardize the deal and if the terms on offer are already defensible. If the agent is a repeat player, the agent can generate greater aggregate compensation by completing more total transactions with slightly less compensation on each deal. When the opposite side in the negotiation is a repeat player that has used and could continue to use the agent's services, then the incentives to maintain goodwill and not push too hard become all the greater.[21]

"Generally, the conflict created by the [contingent] fee skews the advisor bank's incentives in the wrong direction whenever a risky but more valuable alternative crops up, whether in the form of an alternative bidder or a choice over deal terms." William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Tex. L. Rev. 1, 2 (2014).

---

[21] *Rural Metro*, 88 A.3d at 94 (footnotes omitted); *see PLX*, 2018 WL 5018535, at *43 ("Deutsche Bank's contingent fee arrangement . . . gave Deutsche Bank a powerful incentive to favor a sale over having PLX remain independent."); *id.* (citing Deutsche Bank's "thick relationship with [the buyer], which included advising [the buyer] contemporaneously on its acquisition of [another company]"); *TIBCO*, 2015 WL 6155894, at *26 (recognizing that a contingent fee can provide a banker with "a powerful incentive . . . to refrain from providing information to the Board" that could have jeopardized a deal or caused the board to seek a fee reduction); *El Paso*, 41 A.3d at 442 (discussing how a $35-million-or-nothing contingent fee made "more questionable some of the tactical advice given by Morgan Stanley and some of its valuation advice"); *In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (noting that a "contingent fee can readily be seen as providing an extraordinary incentive for [an investment bank] to support the [t]ransaction"); *Forgo v. Health Grades, Inc.*, C.A. No. 5716-VCS, at 10 (Del. Ch. Sept. 3, 2010) (TRANSCRIPT) ("[T]he reality is if [the investment bank] can get a deal, they get a deal."); *In re Netsmart Tech. Inc. S'holder Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007) (noting that although investment bank would receive 1.7% of any deal, it had "a strong incentive to bring about conditions that would facilitate a deal that would close"); *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Jan. 10, 2006) ("[T]he contingent compensation of the financial advisor, DLJ, of roughly $40 million creates a serious issue of material fact, as to whether DLJ (and DLJ's legal counsel) could provide independent advice to the Special Committee.").

Investment banking is also a business that is grounded in relationships. *See PLX*, 2018 WL 5018535, at \*43 (noting that investing banking "values relationships" and that "bankers frequently provide advisory services first and document the engagement letter later"). Relationships build trust and can add value, but they also can affect a sale process.

> [T]he long-term banker-advisor of a selling company has a built-in informational advantage, making it an obvious choice to serve as advisor in a merger. Yet the relationship that creates the advantage can also import conflicts in the form of exterior influences that can negatively affect the judgments and discretionary choices made by banker-advisors and opinion givers. For example, a merger advisor or opinion giver with a preexisting personal relationship with key actors at the seller could cater to their interests. Such catering might privilege the insiders' preferred deal over a more lucrative alternative that makes the shareholders better off. Alternatively, an advising bank could act with a view to obtaining or maintaining a lucrative advisory relationship with the managers of the merger's surviving company. Or, in a financial merger, the banker could have a preexisting business relationship with the private equity buyer, along with expectations of participation in future deals. Such influences again threaten to skew the process toward a suboptimal deal pitched to interests other than the selling shareholders'.

Bratton & Wachter, *supra*, at 20–21 (footnotes omitted).

The complaint alleges that LionTree had established relationships with both Apollo and BCP. LionTree also had an established relationship with Cagnazzi and the Company, and as the CEO of the post-transaction entity, Cagnazzi would be in a position to send future business to LionTree. *See* Dkt. 110 Ex. 3 at '222, '236–37 (indicating Company planned to be a serial acquirer that would use investment banking services).

The allegations of the complaint support an inference that LionTree sought to achieve an outcome that would please Cagnazzi and BCP while providing Apollo with a satisfactory price. The Original Merger Agreement achieved that goal. When CD&R's

expression of interest cropped up, LionTree sought to facilitate a transaction with BCP at an acceptable price, rather than a bidding contest that might have caused BCP to lose the deal or overpay. Cagnazzi had a similar interest in achieving a transaction with BCP at an acceptable price. Not only would he secure post-transaction employment for himself and his brothers, but he would roll over two-thirds of his shares in the BCP transaction, making him a net buyer rather than a net seller.

From LionTree's standpoint, facilitating a transaction with BCP at $16.60 was the winning combination. It delivered the deal that Cagnazzi wanted, and it resulted in a mutually satisfactory deal for two private equity firms where LionTree had existing relationships. Viewed from a plaintiff-friendly perspective, LionTree had a motive to tip BCP about CD&R's price and to withhold that information from the Board.

The pled facts also support a reasonable inference that LionTree knew its tip was wrongful. Under the Original Merger Agreement, BCP was not entitled to receive any information about an Excluded Party or its bid other than its identity. OMA § 6.4(a). CD&R's offer letter similarly communicated CD&R's expectation that its offer would remain confidential, except for disclosure of its identity as required by the Original Merger Agreement. By providing BCP with more information, LionTree acted contrary to the Original Merger Agreement and the parties' expectations. LionTree also put CD&R's bid at risk.

LionTree's silence about its tip reinforces the inference that LionTree knew its actions were wrongful. *See Macmillan*, 559 A.2d at 1282 (inferring that the participants' failure to disclose a wrongful tip was "an explicit acknowledgement of their culpability").

92

*Cf. El Paso*, 41 A.3d at 443 ("Worst of all was that the supposedly well-motivated and expert CEO entrusted with all the key price negotiations kept from the Board his interest in pursuing a management buy-out of the Company's E & P business."). To argue against the inference that LionTree tipped BCP, the defendants insist that LionTree would never have done anything to jeopardize its relationship with Apollo. But that relationship would be jeopardized only if Apollo found out about the tip, and LionTree kept the tip secret. It is reasonable to infer at the pleading stage that LionTree was trying to work both sides of the street.

The complaint's allegations support a reasonable inference that LionTree tipped BCP and then knowingly withheld the information from the Board. Those actions satisfy the requirements for pleading knowing participation.

### 4. Damages

Finally, the complaint sufficiently pleads the existence of damages. At the pleading stage, a plaintiff need not specify a monetary amount. The plaintiff can plead the existence of damages generally as long as the complaint supports a reasonable inference of harm. *See, e.g.*, *In re Ezcorp, Inc. Consulting Agr. Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009). The complaint supports a reasonable inference that the stockholders lost out on a higher valued transaction due to LionTree's tip. That inference is sufficient at the pleading stage.

### E. The Claim For Damages Against BCP

The complaint pleads a claim for damages against BCP. As with the claim against LionTree, the plaintiff advances a theory of aiding and abetting a breach of fiduciary duty.

The claim against BCP is weaker than the claim against LionTree, because BCP was negotiating opposite LionTree to acquire the Company. Under the circumstances, however, it is reasonable to infer that BCP knew LionTree's tip was wrongful and nevertheless capitalized on the information in an effort to take advantage of the situation.

The elements of the claim for aiding and abetting against BCP are the same as the claim against LionTree. The first, second, and fourth elements—the presence of a fiduciary, a reasonably conceivable claim of breach, and damages—are satisfied for the same reasons. The analysis turns on the element of knowing participation.

"A third-party bidder who negotiates at arms' length rarely faces a viable claim for aiding and abetting." *Del Monte*, 25 A.3d at 837. The general rule is that "arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting." *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010). The pleading burden to establish knowing participation against a third-party acquirer is accordingly high. A difficult pleading standard "aids target stockholders by ensuring that potential acquirors are not deterred from making bids by the potential for suffering litigation costs and risks on top of the considerable risk that already accompanies [a transaction]." *Id.*

A high pleading standard, however, is not an insuperable one. Just as the pled facts support a pleading-stage inference that LionTree knew it should not have tipped BCP, the pled facts support a pleading-stage inference that BCP knew the tip was wrongful. BCP had negotiated the Original Merger Agreement and knew that it was not entitled to any information about an Excluded Party other than the party's identity. Yet the factual

94

allegations of the complaint suggest that BCP obtained the price of CD&R's offer and immediately sought to capitalize on it. Until this litigation, however, the conversation between LionTree and BCP remained secret. Nothing about the conversation appeared in the Proxy, even though the Company was obligated under the Original Merger Agreement to permit BCP to review and comment on the Proxy to ensure its accuracy. *See* OMA § 6.5(a).

It also is reasonable to infer that BCP sought to take advantage of the tip by pressuring the Board into curtailing the benefits of CD&R's Excluded Party status. Immediately after receiving the tip, BCP rushed to assemble an exploding offer at just 10¢ above CD&R's price, conditioned on a twenty-four-hour response and an increase in the termination fee, which eliminated one of the two principal benefits of being an Excluded Party. As discussed previously, it is reasonable to infer that the Board's subsequent actions tilted the sale process in favor in of BCP in a manner that fell outside the range of reasonableness. BCP extracted those changes by capitalizing on LionTree's tip.

BCP's conduct also smacks of civil conspiracy. This court largely has equated claims for aiding and abetting and civil conspiracy, noting that the two theories often cover the same ground and that the distinctions usually are not material.[22] "Because it focuses on

---

[22] *See Malpiede*, 780 A.2d at 1098 n.82 (noting in reference to underlying claim for breach of fiduciary duty that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here"); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *22 (Del. Ch. Nov. 26, 2014) (noting in reference to underlying claim for fraud that showing aiding and abetting would necessarily require showing "the elements of civil conspiracy were satisfied," and therefore "the aiding and abetting fraud claim may be duplicative of the civil

assistance, rather than agreement, aiding-abetting rests on a broader conceptual base, one which may overlap conspiratorial conduct, or exist independent of it." *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004) (footnote omitted); *see Great Hill*, 2014 WL 6703980, at *22 ("[I]t seems likely to me that civil conspiracy is, in many cases, to borrow a term, a 'lesser-included' claim within an aiding and abetting claim . . . ."). The two theories differ in their emphasis: "[A]iding and abetting is a cause of action that focuses on the wrongful act of providing assistance, unlike civil conspiracy that focuses on the agreement." *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *17 (Del. Super. Nov. 2, 2011), *aff'd*, 49 A.3d 1168 (Del. 2012). The theories align in that one way to establish knowing participation is to show "an understanding between the parties 'with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.'" *In re Comverge, Inc. S'holders Litig.*, 2014 WL 6686570, at *18 (Del. Ch. Nov. 25, 2014) (quoting *Goodwin*, 1999 WL 64265, at *28).

---

conspiracy count"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014) ("A claim for conspiracy to commit a breach of fiduciary duty is usually pled as a claim for aiding and abetting, and although there are differences in how the elements of the two doctrines are framed, it remains unclear to me how the two diverge meaningfully in substance or purpose."); *Triton*, 2009 WL 1387115, at *17 (finding that claim for aiding and abetting breach of fiduciary duty duplicated claim for civil conspiracy); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (equating claim for aiding and abetting breach of fiduciary duty with conspiracy to commit breach of fiduciary duty), *aff'd*, 906 A.2d 114 (Del. 2006); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) ("A claim for civil conspiracy (sometimes called 'aiding and abetting') requires that three elements be alleged and ultimately established . . . ."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984) (identifying the same elements for "a claim of civil conspiracy" as for aiding and abetting), *aff'd*, 575 A.2d 1131 (Del. 1990).

The factual allegations surrounding LionTree's tip, BCP's eager response, and their collectively successful effort to keep the tip secret until this litigation support an inference that LionTree and BCP reached an agreement regarding LionTree's tip and its subsequent concealment. That inference is sufficient to support a claim for aiding and abetting under the "lesser-included" claim of civil conspiracy. *Great Hill*, 2014 WL 6703980, at *22; *see Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005) ("While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. Claims for civil conspiracy are sometimes called aiding and abetting.").

Discovery may well reveal that BCP negotiated at arm's-length and that there is no basis for any claim against BCP. At this stage, the circumstances surrounding the tip foreclose a pleading-stage dismissal of BCP.

## F. The Claim For Damages Against Cagnazzi

The complaint's allegations state a claim for money damages against Cagnazzi. At the pleading stage, it is reasonably conceivable that Cagnazzi tilted the sale process in favor of BCP and steered the Board away from a deal with CD&R for self-interested reasons.

Under *Gantler*, the standards that govern a claim for a breach of the duty of loyalty against an officer are the same as the standards that govern a similar claim against a director. 965 A.2d at 708–09. To plead a viable damages claim for breach of the duty of loyalty, the plaintiff must plead facts supporting a reasonable inference that the defendant failed to act reasonably to obtain the best transaction reasonably available due to

interestedness, because of a lack of independence, or in bad faith. *USG*, 2020 WL 5126671, at \*29; *see McMillan*, 768 A.2d at 502.

The complaint supports a reasonable inference that Cagnazzi worked with LionTree to steer the sale process towards a transaction with BCP and away from CD&R. As discussed, BCP needed a management team to run the post-transaction company, and BCP made clear from early in the process that it planned to retain Cagnazzi and his brothers. BCP markets itself as "align[ing] [itself] with strong, incentive management teams and companies where there are attractive exit alternatives." Compl. ¶ 24. BCP's original offer letter made clear that BCP intended to retain Company management. *See* Compl. ¶ 63. BCP and Cagnazzi in fact worked out terms for the post-transaction employment of Cagnazzi and his brothers, and BCP and Cagnazzi also agreed on Cagnazzi receiving differential consideration for two-thirds of his shares in the form of a roll-over agreement.

CD&R, by contrast, had acquired Sirius and thus already had a management team that could run the combined company. CD&R did not give any indication that it would retain existing management. CD&R indicated that it would treat a combination of the Company and Sirius as a merger of equals for purposes of social issues and proposed a meeting between Cagnazzi and the Sirius CEO. In its markup of the Original Merger Agreement, CD&R struck the references to Cagnazzi's post-merger employment and the roll-over.

Cagnazzi's obvious reasons for preferring a transaction with BCP make it reasonably conceivable that he was interested in the transaction. The complaint's allegations support a reasonable inference that Cagnazzi worked closely with LionTree to

steer the deal in CD&R's direction. Cagnazzi and Stenzler both attended the June 5 Meeting with CD&R, but at the pleading stage, it is reasonable to infer that neither provided the Board with a meaningful report on the meeting or on CD&R's true level of interest. Lacking that information, the Board directed LionTree to engage only with BCP. Subsequently, after LionTree's tip, BCP sent the Board an exploding offer at $16.60 per share, conditioned on changes that would curtail the benefits of CD&R's Excluded Party status. After the Board sought an extension and BCP refused, Cagnazzi described BCP's response as "[g]ood news." Compl. ¶ 127.

Because the complaint pleads a claim for breach of the duty of loyalty against Cagnazzi, he is not entitled to exculpation to the extent he acted in his capacity as a director. *See* 8 *Del. C.* § 102(b)(7). To the extent that Cagnazzi acted as CEO, which appears to have been his primary role in the sale process, exculpation is not available to him. *See id.* The complaint thus pleads a claim for money damages against Cagnazzi.

## G. The Claim For Damages Against The Directors

The complaint attempts to plead a claim for damages against the directors. The effort to recover money damages from the directors falters on the exculpatory provision in the Company's certificate of incorporation.

The Delaware Supreme Court has instructed that when a plaintiff "seek[s] only monetary damages" from "a director who is protected by an exculpatory provision," then to survive a motion to dismiss, the plaintiff "must plead non-exculpated claims against [the] director . . . , regardless of the underlying standard of review for the board's conduct— be it *Revlon*, *Unocal*, the entire fairness standard, or the business judgment rule."

99

*Cornerstone*, 115 A.3d at 1175–76 (footnotes omitted). To plead a non-exculpated claim, a complaint must allege "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179–80.

### 1. The Outside Directors

The complaint does not plead a non-exculpated claim against the Outside Directors. The complaint does not allege that the Outside Directors faced any conflicts with respect to the Merger. Nor does the complaint allege that any of the Outside Directors lacked independence from a conflicted party. Accordingly, to survive a motion to dismiss, the complaint had to allege facts supporting a reasonable inference that the Outside Directors acted in bad faith.

The plaintiff first contends that the Outside Directors acted in bad faith by "proceed[ing] on a course of action without caring about the risk." Dkt. 124 at 47. The complaint does not allege any conduct by the Outside Directors that would support such an extreme inference. Based on the complaint's allegations, the only reasonable inference is that the Outside Directors evaluated the Merger based on the information they had. The complaint supports a reasonable inference that the directors lacked material information, but not that the directors acted in bad faith.

The plaintiff next argues that the Outside Directors' decision to "allow[] a conflicted and less-than-forthcoming LionTree to advise the [Board] and conduct an unfair auction" supports a reasonable inference of bad faith. *Id.* at 47–48. At most, this allegation pleads

100

that the Outside Directors were insufficiently careful in supervising LionTree. Exculpation prevents the plaintiff from recovering on that theory.

The plaintiff then argues that the Outside Directors acted in bad faith by "approv[ing] an amendment to the Go-Shop that CD&R told the Board would preclude an 'at least $17' per share offer" and "adopt[ing] spurious reasons to spurn CD&R and conclude that its September 25 offer was not a [Company] Superior Proposal." *Id.* at 48. If the complaint supported a reasonable inference that the directors' reasons for not engaging with CD&R were knowingly false, then the complaint would plead a non-exculpated claim. But the factual allegations in the complaint do not give rise to such an inference. In hindsight, the directors' reasons seem weak, but they do not appear to have been advanced in bad faith.

The complaint's allegations do not support a reasonable inference of bad faith. The claims against the Outside Directors thus cannot survive a motion to dismiss.

### 2. The Apollo Directors

For purposes of pleading a non-exculpated claim, the only meaningful difference between the Outside Directors and the Apollo Directors is that the latter were affiliated with Apollo. These directors therefore faced the "dual-fiduciary problem" identified in *Weinberger*, in which the Delaware Supreme Court held that "[t]here is no dilution of [fiduciary] obligation" when a director holds "dual or multiple" fiduciary positions and "no 'safe harbor' for such divided loyalties in Delaware." 457 A.2d at 710. "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict. But if the interests of the beneficiaries diverge, the fiduciary faces an inherent

101

conflict of interest." *Trados II*, 73 A.3d at 46–47 (citation omitted); *accord Chen*, 87 A.2d at 670.

This decision already has found that the complaint fails to plead facts supporting a reasonable inference that Apollo had a divergent interest in the Merger. Because Apollo's interests did not diverge from those of the unaffiliated stockholders, the complaint fails to plead a non-exculpated claim against the Apollo Directors. The only theories against them implicate the duty of care, for which they are exculpated against money damages.

## H. The Damages Claim Against Apollo

The complaint attempts to plead a claim for money damages against Apollo. Because Apollo's interests were aligned with those of the stockholders as a whole, the only possible theory of recovery would be for a breach of the duty of care. Assuming for purposes of analysis that Apollo owed a duty of care as a controlling stockholder, the complaint fails to plead facts supporting an inference of gross negligence.[23]

Delaware cases have not analyzed the extent to which a controlling stockholder owes a duty of care.[24] As discussed previously, it is generally understood that when a

---

[23] The complaint contends that to the extent Apollo was not itself a fiduciary, Apollo aided and abetted breaches of duty by other fiduciaries. The defendants do not dispute that Apollo was a fiduciary for purposes of the motion to dismiss, and this decision therefore analyzes Apollo's liability as a fiduciary, rather than an alleged aider and abettor.

[24] *See* J. Travis Laster & Steven M. Haas, Abraham v. Emerson Radio*: Duties of a Controlling Stockholder in a Sale of Control*, 10 No. 8 M & A Law. 1 (2006) ("It is well established that controlling stockholders owe fiduciary duties to minority stockholders. Historically, these duties have been shaped through claims for breach of the duties of

102

stockholder exercises control over a corporation, the stockholder takes on the same fiduciary duties owed by directors. Based on that proposition, several Delaware decisions have recognized that a controlling stockholder owes a duty of care.[25]

An open question under Delaware law is whether an exculpatory provision that eliminates liability for a breach of the duty of care for the director representatives of a controlling stockholder also eliminates liability for a breach of the duty of care by the controlling stockholder. In *Shandler*, then-Vice Chancellor Strine held that a controlling stockholder could not be held liable for a breach of the duty of care if its board representatives would be exculpated. He reasoned as follows:

> [T]he premise of controlling stockholder fiduciary responsibility is to hold the controller liable for actions its causes using its control of the company's board, liability under this theory is largely coextensive with the liability faced by the corporation's directors. That is, a controlling stockholder cannot be held liable for a breach of the duty of care when the directors are exculpated. The purpose of controlling stockholder liability is to make sure that

---

loyalty or disclosure, with little analysis of whether controlling stockholders are subject to a duty of care.").

[25] *See*, *e.g.*, *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 406 (Del. 1988) (referring to the controlling stockholder's "general fiduciary duties of loyalty and care"); *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at \*19–20 (Del. Ch. June 24, 1991) ("[W]hen a shareholder, who achieves power through the ownership of stock, exercises that power by directing the actions of the corporation, he assumes the duties of care and loyalty of a director of the corporation."), *rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993); *see also Harris*, 582 A.2d at 235–36 (imposing duty of reasonable care on controller selling shares under ordinary tort principles). *But see* Jens Dammann, *The Controlling Shareholder's General Duty of Care: A Dogma That Should Be Abandoned*, 2015 U. Ill. L. Rev. 479 (2015) (surveying authorities which suggest that a controlling stockholder owes a duty of care and arguing for the rejection of the duty).

controlling stockholders do not use their control to reap improper gains through unfair self dealing or other disloyal acts.[26]

But there is a plain-language problem with extending exculpation to controllers. Section 102(b)(7) only applies to directors. *See* 8 *Del. C.* § 102(b)(7). Based on the language of Section 102(b)(7), the Delaware Supreme Court has declined to extend exculpation to aiders and abettors, even when the aider and abettor facilitated otherwise exculpated breaches of duty by directors. *RBC*, 129 A.3d at 874. Using the same plain-language reasoning, the Delaware Supreme Court also has declined to extend exculpation to officers. *Gantler*, 965 A.2d at 709 n.37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers."). Parallel analysis forecloses exculpation for controllers.

As support for extending exculpation to controllers, *Shandler* cited a non-Delaware decision that relied on principles of agency law, including the proposition that "[o]rdinarily, a principal cannot be sued for acts of an agent for which the agent cannot be sued."[27] Delaware law generally does not deploy agency principles when analyzing the

---

[26] *Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010) (footnotes omitted); *see Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006) (questioning the logic of holding a controlling shareholder liable when care claims against directors were exculpated and noting that "the unthinking acceptance that a greater class of claims ought to be open against persons who are ordinarily not subject to claims for breach of fiduciary duty at all—stockholders—than against corporate directors is inadequate to justify recognizing care-based claims against sellers of control positions").

[27] *Off. Comm. of Unsecured Credit of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 515 (S.D.N.Y. 2001). The *Shandler* decision also cited Vice Chancellor Strine's decisions in *Abraham* and *Trenwick America Litigation Trust v. Ernst & Young,*

104

fiduciary relationship between directors and stockholders.[28] Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders. *See Bovay v. H. M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944); *Guth v. Loft, Inc.*, 5 A.2d 503, 509–10 (Del. 1939). When dealing with the imposition of liability rather than the availability of exculpation, this court has rejected the

---

*L.L.P.* 906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (ORDER)). In the latter decision, Vice Chancellor Strine stated that "[a] judicial acknowledgement that, as a matter of the common equity, directors of a public company protected by an exculpatory charter provision may be exposed to negligence-based liability claims made by the public company's wholly-owned subsidiaries would undercut the important public policy reflected in 8 Del. C. § 102(b)(7)." *Id.* at 194, *quoted in Shandler*, 2010 WL 2929654, at *16 n.140 (citing *Trenwick*,

[28] *See, e.g.*, *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 509 (Del. 2005); *Skye Mineral Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *24 (Del. Ch. Feb. 24, 2020); *Abercrombie v. Davies*, 123 A.2d 893, 898–99 (Del. Ch. 1956). There are isolated cases that loosely refer to stockholders as principals and directors as their agents, but these descriptions appear more metaphorical than doctrinal. *See, e.g.*, *Calma v. Templeton*, 114 A.3d 563, 579 (Del. Ch. 2015) ("In the corporate law context, stockholders (as principal) can, by majority vote, retrospectively and, at times, prospectively, act to validate and affirm the acts of the directors (as agents)." (footnote omitted)); *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007) (asserting that requiring directors to specify the precise amount and form of their compensation when seeking stockholder ratification "ensure[s] integrity" in the underlying principal-agent relationship between stockholders and directors); *UniSuper Ltd. v. News Corp.*, 2005 WL 3529317, at *8 (Del. Ch. Dec. 20, 2005) (analogizing directors to agents and stockholders to principals). Given that Section 141(a) of the Delaware General Corporation Law confers statutory authority on the board of directors to manage the business and affairs of the corporation, "[c]learly, directors are not mere agents." Julian Velasco, *Fiduciary Duties and Fiduciary Outs*, 21 Geo. Mason L. Rev. 157, 164 (2013); *see* Stephen M. Bainbridge*, Director Primacy: The Means and Ends of Corporate Governance*, 97 Nw. U.L. Rev. 547, 605 (2003) (reviewing authorities and concluding that "the board of directors is not a mere agent of the shareholders"); Deborah A. DeMott, *The Mechanisms of Control*, 13 Conn. J. Int'l L. 233, 253 (1999) ("Even when the parent owns all the stock in the subsidiary, its directors are not agents of the parent.").

use of agency principles like *respondeat superior* to impose liability on a stockholder for the acts of its director representative. *See Khanna v. McMinn*, 2006 WL 1388744, at \*28 (Del. Ch. May 9, 2006); *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at \*20 n.18 (Del. Ch. Aug. 20, 1996).

It also is possible that a controller could cause a corporation or its unaffiliated stockholders to suffer harm by exercising control through means other than its director nominees. Sources of control can include relationships with key managers or advisors, the exercise of contractual rights to channel the corporation into a particular outcome, and the existence of commercial relationships that provide leverage over the corporation, such as status as a key customer, supplier, or lender. *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at \*26 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (ORDER). If a corporation has an exculpatory provision, but the controller's potential liability stems from a non-exculpated source, then it does not follow that the controller's actions should be exculpated.

This decision need not decide whether Apollo is entitled to indirect exculpation, because even if exculpation is not available, the plaintiff has not pled an actionable claim against Apollo. The plaintiff can only survive dismissal by pleading facts supporting an inference that Apollo acted with gross negligence. In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of

negligence representing 'an extreme departure from the ordinary standard of care.'"[29] "In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) (internal quotation marks omitted). "Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." *Albert*, 2005 WL 2130607, at *4 (internal quotation marks). To be grossly negligent in this context, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Solash*

---

[29] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1999) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)), *cert. denied*, 499 U.S. 952 (1991). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.* § 231(a). Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Jardel*, 523 A.2d at 530.

*v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (citations and internal quotation marks omitted).

The complaint does not plead any conduct by Apollo that rises to the level of recklessness. At best for the plaintiff, the sale process fell outside the range of reasonableness. Unreasonableness does not equate to recklessness. The complaint fails to state a claim for monetary damages against Apollo, so that aspect of the complaint is dismissed.

## IV. THE DISCLOSURE CLAIMS

In addition to the sale process claims, the plaintiff contends that the fiduciary defendants breached their duty of disclosure. The only meaningfully pled disclosure claim centers on LionTree's tip.

### A. The Duty Of Disclosure

There is no question that the members of the Board had a duty of disclosure in connection with the Merger. As directors, the members of the Board owed a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

It also is clear that Cagnazzi had a duty of disclosure in this context. As an officer, Cagnazzi's duties were "the same as those of directors." *Gantler*, 965 A.2d at 709. This court has sustained claims against officers for failing to disclose material information in proxy statements for mergers. *See, e.g.*, *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *19–23 (Del. Ch. Nov. 30, 2020); *In re Baker Hughes, Inc. Merger Litig.*, 2020 WL 6281427, at *15–16 (Del. Ch. Oct. 27, 2020).

108

It is not clear whether a controlling stockholder owes a separate duty of disclosure in the context of a third-party merger. This court recently observed that a controlling stockholder "owe[s] the same fiduciary duty of disclosure as directors." *In re WeWork Litig.*, 2020 WL 6375438, at \*13 (Del. Ch. Oct. 30, 2020). The court observed that the duty of disclosure generally arises when the controller is "seeking shareholder action" or "communicating publicly or directly with shareholders about the corporation's affairs, with or without a request for stockholder action." *Id.* (alterations and internal quotation marks). In *WeWork*, the court held that the duty of disclosure was not implicated on the facts presented. *Id.*

The current case involves a request for stockholder action, but it is not apparent that the controller is requesting stockholder action such that it would take on an independent duty of disclosure. The Delaware Supreme Court has made clear that a controller has a duty of disclosure when it makes a tender offer. *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 279 (Del. 1977). A controller also has a duty of disclosure when it seeks to effectuate an interested long-form merger. *See Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 88 (Del. 1995). The controller's duty of disclosure is the only fiduciary duty that applies in connection with a short-form merger. *Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 248 (Del. 2001). As *WeWork* suggests, if a controller chooses to speak, the controller has a fiduciary duty to speak honestly. *See also Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998).

This case, however, involves a third-party merger and an unconflicted controlling stockholder. The directors approved the Amended Merger Agreement and recommended

109

the Merger to the stockholders. The Company's directors and officers issued the Proxy and the Supplement. Apollo never spoke independently. In this setting, the plaintiff has not provided any authority to support Apollo having an independent duty of disclosure. The disclosure claim against Apollo is therefore dismissed.[30]

## B.     The Scope Of The Duty Of Disclosure

When seeking injunctive relief for a breach of the duty of disclosure in connection with a request for stockholder action, a plaintiff need only show a material misstatement or omission. When seeking post-closing damages for breach of the duty of disclosure, however, the plaintiffs must prove quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted). The duty of disclosure arises because of "the application in a specific context of the board's fiduciary duties." *Malpiede*, 780 A.2d at 1086. A plaintiff that seeks to recover damages for a breach of the duty of disclosure also must establish that the

---

[30] Although sufficient for this case, this reasoning is not wholly satisfying from a doctrinal perspective, because there could be circumstances where it is difficult to think that a court of equity would ignore a disclosure problem created by a controller. Envision an extreme situation in which the controller knew that a third-party merger would yield a self-dealing benefit for the controller that the controller kept secret. It seems unlikely that the status of the transaction as a third-party merger would enable the controller to obtain dismissal. That scenario might well be another setting in which a stockholder plaintiff would have a claim for fraud on the board. *See* Friedlander, *supra*, at 1443-44.

110

fiduciary acted with "a culpable state of mind" or engaged in "non-exculpated gross negligence." *Wayport*, 76 A.3d at 315.

## C. The Alleged Disclosure Violations

The first step in pleading a claim for damages for breach of the duty of disclosure is to plead facts supporting an inference that that the fiduciary failed to disclose material information. This decision already has found it reasonably conceivable that the fiduciary defendants failed to disclose material information by not disclosing LionTree's tip. The plaintiff identifies five other disclosure violations, none of which is material.

First, the plaintiff contends that the fiduciary defendants did not disclose adequately the Board's concerns about the CFIUS condition to CD&R's bid. The Supplement stated,

> The Presidio Board also considered that the [CD&R] Proposal contemplated a CFIUS filing and related closing condition, which the Company's CFIUS counsel determined likely was not required. . . .

> [CD&R] additionally stated that it planned to submit a definitive debt commitment letter with its final proposal, but did not provide any more definitive assurances regarding its ability to secure committed debt financing or a willingness to eliminate CFIUS as a closing condition.

That disclosure informed stockholders that the Board considered the CFIUS condition in CD&R's bid. The plaintiff has questioned whether the Board should have regarded CD&R's bid as subject to CFIUS, but that is not a disclosure claim. The fact that the Board considered the CFIUIS condition was disclosed.

Second, the plaintiff contends that the directors did not describe adequately "Apollo's role in the negotiations and discussions concerning Presidio." Compl. ¶ 168. This allegation is too vague to support a disclosure claim. Moreover, it does not appear that

111

Apollo interfered with the sale process. The complaint's allegations support a reasonable inference that LionTree and Cagnazzi steered the transaction to BCP and away from CD&R. The complaint's allegations also support a reasonable inference that BCP took advantage of LionTree's tip. The complaint's allegations do not provide any basis to believe there was a need for additional disclosure regarding Apollo's role in the negotiations and discussions.

Third, the plaintiff contends that the directors did not describe adequately "the Board's review of LionTree's conflicts arising from its fee relationships with Apollo and BCP." Compl. ¶ 169. The Supplement stated that on August 5, 2019,

> the Presidio Board discussed certain conflict disclosures provided to the Presidio Board by LionTree, and approved finalizing engagement terms with LionTree on the basis of the disclosures that had been provided as well as precedent fee information for comparable transactions the Board received prior to the meeting.

This disclosure accurately described what the Board did. It is reasonably conceivable that the Board's oversight of LionTree fell outside the range of reasonableness, but that is not a disclosure claim. The extent to which the Board considered LionTree's conflicts was disclosed.

Fourth, the plaintiff argues that the board did not fully describe "Apollo's interest in a near-term liquidation of its Presidio investment." Compl. ¶ 168. The complaint's allegations do not support a reasonable inference that Apollo had this interest. The omitted disclosure thus does not support a disclosure claim.

Finally, the plaintiff contends that the Merger Disclosures did not describe "the import of the changes to the Go-Shop." *Id.* The Supplement contained the following disclosure:

> LionTree also confirmed the higher break fee of $40 million in the amended Merger Agreement would now apply to Excluded Parties (including [CD&R]), and told [CD&R] that they continued to qualify as an Excluded Party under the Merger Agreement and that the Company was permitted to and prepared to continue discussions with [CD&R] to assist [CD&R] in submitting an improved and definitive offer.

This description was accurate. Under the Amended Merger Agreement, CD&R still could submit a bid until 11:59 p.m. on October 3, 2019. The problems for the sale process were that the Board had insisted that CD&R respond to BCP's post-tip proposal within twenty hours, then agreed to BCP's demand for a higher termination fee of $40 million. The Merger Disclosures adequately described the only formal change to the Go-Shop Provision, so the plaintiff's allegations do not support a disclosure claim.

## D. An Actionable Claim For Damages

Having pointed to a failure to disclose material information in the form of LionTree's tip, the plaintiff next must plead facts supporting an inference that one or more of the fiduciary defendants withheld the information knowingly or because of non-exculpated gross negligence. Because LionTree kept the tip secret until this litigation, the disclosure claim poses difficult doctrinal issues.

In *Rural Metro*, this court confronted a similar situation in which a financial advisor withheld two items of material information from the company's directors. *See* 88 A.3d at 103–06. This court held the directors responsible under the principle that the Board has

"fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Id.* at 104 (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)); *accord Malone*, 722 A.2d at 12 ("The directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control when it seeks shareholder action."). The court recognized that the financial advisor "created" one of the disclosure violations "by including false information in its valuation materials, which the directors then summarized." *Rural Metro*, 88 A.3d at 107. The financial advisor also created the other disclosure violation, because only the financial advisor "knew the full extent of its conflicts." *Id.* The court held that the financial advisor's withholding of the information induced the directors to breach their duty of care, which in turn provided the predicate fiduciary wrong for the financial advisor to be held liable for aiding and abetting. *Id.* at 103. On appeal, the Delaware Supreme Court affirmed this holding, agreeing that the information was "reasonably available" to the directors and therefore subject to disclosure, which supplied the predicate fiduciary wrong. *RBC*, 129 A.3d at 859.[31]

---

[31] In *Rural Metro*, the other defendants had settled, so only the actual wrongdoer—the financial advisor—faced liability. The use of an aiding-and-abetting framework thus produced an equitable result, but the same approach could prove problematic on other facts. The attorney for the plaintiffs who prevailed in *Rural Metro* has argued that regarding directors as having breached their duty of care is problematic and relies on a "legal fiction" because the "information in question was deemed 'reasonably available' to the directors, but it was neither gathered by the directors nor known to them." Friedlander, *supra*, at 1487 (footnote omitted). As a solution, he argues that Delaware law should bridge the gap between the wrong and the wrongdoer through a claim for fraud on the board. *See id.* at 1488–92. Under this approach, a stockholder plaintiff could sue LionTree for causing the disclosure violation without having to prove a breach of duty by the directors. Just as the

Under the reasoning of *Rural Metro*, the complaint pleads a claim for breach of fiduciary duty against the Board and Cagnazzi for failing to disclose the tip, even though they did not learn of the tip until this litigation. Moreover, in this case, the Company issued the Supplement after the Board and Cagnazzi learned about the tip. At that point, they had an obligation to disclose all material information that was "reasonably available" to them. *RBC*, 129 A.3d at 859. In the face of that obligation, they issued a Supplement that contained a materially misleading description of the tip.

As to the members of the Board other than Cagnazzi, the pled facts at most support a breach of the duty of care. That claim cannot lead to money damages because the directors are protected by the exculpatory provision. The disclosure claim against the members of the Board other than Cagnazzi is dismissed.

The claim against Cagnazzi is not subject to dismissal. He is not entitled to exculpation in his capacity as an officer. It also is reasonably conceivable that Cagnazzi's interest in the Merger may have tainted his actions with respect to the disclosure of the tip. The complaint therefore states a claim against Cagnazzi for the materially misleading disclosures in the Supplement. *See Roche*, 2020 WL 7023896, at \*19–23 (denying motion to dismiss breach of fiduciary duty claim seeking compensatory damages against officer for disclosures in proxy statement); *Baker Hughes*, 2020 WL 6281427, at \*15–16.

---

pled facts support a claim for fraud on the board relating to the sale process, they also would support a claim for fraud on the board in connection with the disclosures in the Proxy and the Supplement.

**E.    Reliance, Causation, And Damages**

The complaint satisfies the remaining elements of a claim for breach of the duty of disclosure. At the pleading stage, the complaint need not prove "actual reliance on the disclosure, but simply that there was a material misdisclosure." *Metro Commc'n Corp. BVI v. Adv. Mobilecomm Techs. Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004). The holding that the misleading disclosure was material is sufficient at the pleading stage to satisfy the element of causation. "The Complaint need not plead that omissions or misleading disclosures were so material that they would cause a reasonable investor to change his vote." *Roche*, 2020 WL 7023896, at *24. By the same token, the complaint does not have to plead that providing the information would have changed the result of the vote. Damages at this stage of the case can be pled generally. Further "consideration of damages awaits a developed record." *Morrison*, 2019 WL 7369431, at *22 n.273.

## V.    CONCLUSION

All of the claims against Apollo, the Apollo Directors, and the Outside Directors are dismissed. The complaint pleads a claim for breach of fiduciary duty against Cagnazzi. It also pleads claims against LionTree and BCP for aiding and abetting breaches of fiduciary duty.